UNITED STATES v. EASTERN STATES RETAIL LUMBER DEALERS' ASS'N et al.

(District Court, S. D. New York. January 9, 1912.)

1. MONOPOLIES (§ 12*)—SHERMAN ANTI-TRUST ACT—COMBINATIONS IN RESTRAINT OF TRADE—LUMBER DEALERS' ASSOCIATIONS.

Associations of retail lumber dealers, which issue and distribute among their members "official reports," containing lists of wholesale dealers doing an interstate business, who have made sales direct to consumers, and soliciting information as to other such sales, for the purpose and with the effect of influencing members receiving them to cease buying from such wholesale dealers, are combinations in restraint of interstate trade and commerce, and unlawful, under Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

2. MONOPOLIES (§ 12*)—SHERMAN ANTI-TRUST ACT—"RESTRAINT OF TRADE."

The words "restraint of trade," as used in Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), are to be construed as including "restraint of competition."

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 7, pp. 6185, 6186.]

In Equity. Suit by the United States against the Eastern States Retail Lumber Dealers' Association and others. Decree for complainant.

This is an action under the Anti-Trust Act, brought by the United States against various associations and corporations composed of retail lumber dealers, who are charged with being parties to a general conspiracy and combination, which it is alleged has limited competition and unlawfully obstructed the free flow of trade and commerce among the states in lumber and lumber products.

Clark McKercher, Special Asst. Atty. Gen., of Washington, D. C., for the United States.

Alfred B. Cruikshank, of New York City, for Eastern States Retail Lumber Co. and others.

Morgan, Lewis & Bockius, of Philadelphia Pa. (Howard Taylor, of St. Louis, Mo., of counsel), for Philadelphia Retail Lumber Dealers.

Before LACOMBE, COXE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. [1] Although the record is a long one, the concrete questions here presented lie within a narrow compass. Certain resolutions, which at one time or another were adopted at conferences between the defendants represented by delegates,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were abrogated some time before the suit was brought. Various lists were circulated in the trade, at one time or another, known in the record as the "Yes List," the "No List," "List No. 1," "List No. 2," and "List C"; but the circulation of such lists stopped before suit was brought, and there is nothing in the record to indicate that there is any intention to resume their circulation by defendants or by any one else. The extensive testimony as to these earlier resolutions and lists was properly introduced as illuminative of the intent with which the continuing circulation of other lists is carried on and of the object sought to be obtained thereby.

The lists which are still being circulated may be called, for lack of a better name, "Official Reports." Nothing else, so far as we understand it, is now or was being done at the time suit was brought by defendants as a combination, except the circulation of these lists, among the members of retail lumber dealers' associations and corporations. This seems to be the extent of their offending. Each of these Official Reports reads as follows:

"Official Report.

"[Name of the Particular Association Circulating It.]

"Statement to Members [with the Date].

"You are reminded that it is because you are members of our Association, and have an interest in common with your fellow members in the information contained in this statement, that they communicate it to you, and that they communicate it to you in strictest confidence and with the understanding that you are to receive and treat it in the same way.

"The following are reported as having solicited, quoted, or as having sold direct to the consumers: [Here follows a list of the names and addresses of various wholesale dealers.]

"Members, upon learning of any instance of persons soliciting, quoting, or selling direct to consumers, should at once report same, and in so doing should, if possible, supply the following information:

"The number and initials of car.

"The name of consumer to whom the car is consigned.

"The initials or name of shipper.

"The date of arrival of car.

"The place of delivery.

"The point of origin."

A brief statement of the conditions of the lumber business will make plain the bearing of this circular. The trade for a long time has been naturally divided into separate groups:

1. The manufacturer or millman usually turns the standing timber or the felled trees into one or more kinds of rough lumber. He sells either directly to the retail yard dealer, or to the wholesale dealer, or to large consumers using large quantities of one kind of lumber.

2. The wholesale dealers are usually located at or near the large markets, such as New York, Chicago, etc. In some cases the wholesale dealer maintains a yard; but usually he does not do so, acting as middleman to transmit orders from his customer to the millman, who fills the order direct to the customer. A very large part of the wholesaler's business is the selling of large lots (car load or schooner load shipments) to the retail dealer. There are some wholesalers who make it a rule to sell and ship only to retail yards; others sell only to large

consumers; others sell to both classes. The brief for the government contains this statement which seems to be supported by the record:

"It has been the custom for nearly all manufacturers, millmen, and wholesalers of good standing to protect the retail yard dealer in any city by refusing to sell to a consumer who is a customer of the retail yard dealer to whom such manufacturer or wholesaler sold lumber. But there is and always has been a large class of reputable manufacturers and wholesale dealers who sell lumber to large consumers in any city where such manufacturers and wholesalers have no customers among retail yard dealers, or where the large consumer is not a customer of any yard at retail prices."

3. The retail dealers are located in nearly every town and city in the New England and Middle states. They have yards in which they store lumber bought from the wholesaler or the millman. From his yard the retailer supplies the local demand for building or manufacturing purposes. In some places the retailer also delivers lumber to the consumer directly from schooners or cars, without first placing in his yard, where the order is for a large quantity.

4. The consumers are divided into several groups: (a) The contracting builder of houses, bridges, wharves, and who also does repair and construction work of all kinds. (b) The converter or manufacturer, who converts the sawed lumber into furniture and "trim," such as moldings, frames, sash, doors, and blinds, and in some cases into boxes and containers. (c) The United States government, and, in some localities, municipalities and railroads. (d) The small consumer of lumber for small building, repair, and construction work. (e) Large factories and manufacturing establishments using lumber in large quantities for special purposes.

The retail dealer has to carry many different kinds of lumber in stock in his yard to make prompt delivery of what may be called for. The natural customer of the retailer is the local contracting builder, who requires either a large number of items in small lots or particular items for immediate delivery. He also secures some of the trade of other consumers, such as large contracting builders of railroads, docks, etc., and factories of all sorts.

For a number of years there has been friction between the two groups, wholesalers and retailers. Wholesalers have complained because some retail dealer has not been content with selling in small lots for local delivery, but has negotiated sales of large lots from millmen to consumer. Retailers have complained because some wholesalers, having discovered a retail dealer's local customers, have themselves sold to such local customers in competition with the retailer. We need not go into the details of this controversy, which are spread out at great length in the record. Suffice it to say that the "Official Report" is a method adopted by the retailers to check this competition. Retail dealers, who are members of one or other of these associations defendant, are not required by their associations to refrain from dealing with any wholesaler whose names are on the list. There is no fine or penalty for dealing with them; nor is the retailer disciplined in any way if he does deal with them. But the record indicates that no such discipline is necessary. A retail dealer, who learns that some wholesaler has taken away customers from another retail dealer, will not be likely to buy from him, lest, learning the names of his own

customers, the wholesaler might compete with himself to get their trade. In the brief filed for one of the defendants there is a frank and concise summary of the situation:

"Ordinarily speaking, and other things being equal, a retailer would not buy his own source of supply from people on these lists, and wholesalers would object strongly to getting on these lists, because, if they were found out at the business of selling retailers' customers, they knew a retailer would be shy of buying from them."

To a greater or less extent, therefore, the circulation of these "Official Reports" operates to prevent some wholesalers, who otherwise would enter into competition with retailers in supplying consumers, from undertaking so to compete. That the reports are prepared and circulated to accomplish that very object is manifest.

No doubt every retail dealer has a right to choose from whom he will buy. He has a right to impart to any one else any information he may have about the business methods of any one, even though the natural result of thus telling what he knows may induce the person whom he tells to cease business relations with the other person. May the several retail dealers combine into an association, in order the better to acquire and distribute knowledge about the business methods of others, by means of the circulation among themselves of reports such as these?

[2] It seems to us that they cannot do so without violating the Sherman Act. It is now well settled that the words "restraint of trade" in that act are to be construed as including "restraint of competition." Full, free, and untrammeled competition in all branches of interstate commerce is the desideratum to be secured.

Much is said in argument of the evils which will result if the retail dealers are prevented from taking defensive measures to restrain the competition with them of the wholesaler, who, having no yard, and not seeking the smaller local trade of the retailer, is endeavoring to take away the profitable part of his trade. It is pointed out that it is expensive for a retailer to maintain a yard, with large quantities of a great variety of lumber in it, ready for prompt delivery at all times. If his business shrinks, through his losing the chance of making car and schooner load sales in his locality, the local yard, it is said, will become less and less well stocked, and will finally disappear entirely. But with such ultimate results the court is not concerned. Congress has considered the results, and chosen what seemed to it the wisest course.

"Competition, free and unrestricted, is the general rule which governs all the ordinary business pursuits and transactions of life. Evils, as well as benefits, result therefrom. In the fierce heat of competition, the stronger competitor may crush out the weaker; fluctuations in prices may be caused, that result in wreck and disaster; yet, balancing the benefits as against the evils, the law of competition remains as a controlling element in the business world. That free and unrestricted competition * * * may be productive of evils does not militate against the fact that such is the law now governing the subject." U. S. v. Freight Association, 166 U. S. 337, 17 Sup. Ct. 557, 41 L. Ed. 1007.

The circulation of this circular certainly tends to restrain, directly, some wholesalers from entering into competition with retailers. This

seems to be contrary to the statute as the Supreme Court has construed it. That the defendants and their members are in a combination to prepare such circulars and to distribute them is manifest.

We conclude that the government is entitled to an injunction against the further circulation of these "Official Reports."