**LIVE POULTRY DEALERS' PROTECTIVE ASS'N et al. v. UNITED STATES.**

(Circuit Court of Appeals, Second Circuit. December 2, 1924.)

No. 116.

1. **Commerce ⊙—40(1)—Buying in New York market from agents of interstate shippers held interstate commerce.**

Buying of live poultry in New York market by wholesale dealers from commission men, who received poultry in carloads, crated it, and sold it as agents for shippers from various other states, *held* to constitute interstate commerce.

2. **Commerce ⊙—8(12)—Power of state to tax goods from other states is not measure of powers of Congress over interstate commerce.**

Power of state to tax goods from other states is not measure of powers of Congress over interstate commerce.

3. **Monopolies ⊙—17(1)—Sherman Act prohibits agreements preventing competition in price among buyers, if they are numerous enough to affect market.**

Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) prohibits all agreement preventing

competition in price among group of buyers otherwise competitive, if they are numerous enough to affect market, without showing prejudice to public.

**4. Injunction ⊛136(1)—Pendente lite writ issued. where it is probable that defendant will violate plaintiff's rights.**

Though plaintiff's right to injunction pendente lite must be beyond dispute before it will issue, where it is probable that defendant will violate such right, injunction should be issued.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the United States against the Live Poultry Dealers' Protective Association and others. From an order (298 F. 139) granting complainant's motion for an injunction pendente lite, defendants appeal. Affirmed.

Appeal from an order of the District Court for the Southern District of New York (Winslow, District Judge, presiding), granting an injunction pendente lite forbidding the defendants, wholesale buyers, from fixing, establishing, or publishing prices to be observed in the purchase of poultry, and from boycotting such receivers or commission men of the sellers as sell to wholesalers at other prices than those so fixed, and from discriminating against such commission men or wholesalers as do not observe such prices.

Koenig, Sittenfeld & Aranow, of New York City (Goldstein & Goldstein, Jonah J. Goldstein, and Aiken A. Pope, all of New York City, of counsel), for appellants.

William Hayward, U. S. Atty., of New York City (David A. L'Esperance, Jr., and Rush H. Williamson, both of New York City, and Ryland W. Joyce, Sp. Asst. U. S. Atty., of Washington, D. C., of counsel), for the United States.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge. The case comes up upon an injunction pendente lite, issued upon a petition in equity under the Sherman Act against the defendants, enjoining them from certain practices adopted by them in the city of New York in the live poultry business. The corporate defendant was organized in 1914 by certain wholesale buyers of live poultry in the city of New York, who number in all somewhat over 300. Of these 178 have joined the association, whose general purposes it is not here necessary to state. Live poultry, which is sold at once upon its arrival, is shipped in carload lots from the Middle Western states to Hoboken, where it is put into crates and sent across the river. The consignees are receivers or commission merchants, who, acting as the shippers' agents, sell the poultry for them on its arrival here. They are only 18 in number. The poultry is sold either in the city of New York, at the Washington Market, or in small quantities at Hoboken, whence the buyer brings it here.

Before the defendants adopted the practices of which the plaintiff complains, the prices for live poultry had been determined without any rule and according to the higgling of the buyers and sellers. The defendants assert (and it must be accepted upon this proceeding) that during those times the market was in what they call a "demoralized" condition, prices being often determined by "wash" or "fake" sales, which did not represent real transactions. This resulted in frauds upon the buyers, and in the end a higher price to the consumers. It was the purpose of the association, by "stabilizing" prices, to give both the buyers and sellers a reliable guide upon which to deal, and thus to eliminate opportunities for bad trade practices.

Before the 1st of June, 1923, the defendants determined to regulate the purchase of this poultry in execution of these purposes. They appointed a committee of seven of their members, who were daily to treat with the receivers or commission men, and after negotiations, with an eye upon the prospective supply and the demand, to establish a price for that day, which should obtain as to all purchases made by any member of the association. On June 1, 1923, they sent out a circular announcing the names of the seven members who had been appointed, and who were "fully authorized to bid upon the prices of poultry in order to obtain a market price thereof." Any four members of this committee should have power to act. In pursuance of this plan the committee went daily to the receivers and commission men, and after negotiation fixed prices which they conceived to be proper for that day. In many cases the poultry would be bought and shipped to the buyers before the price had been adjusted, and the contracts later liquidated in accordance with the prices so fixed.

The plaintiff asserts that in execution of this plan the association has threatened some receivers and commission men with a boycott if they should sell to any members of the association at other prices than those fixed and in some cases to other buyers than members.

The last allegation, although supported by affidavits, is in dispute, though the defendants concede that as a matter of its own internal discipline the association has insisted that the commission men shall sell to members only at the agreed prices, and has enforced that insistence by threatening not to deal with such as would not observe them.

[1] The defendants raise two chief objections: First, that the commerce is not interstate; and, second, that the agreement is not an unreasonable restraint of trade. As to the first, it should be noticed that the poultry reaches Washington Market after a pause at Hoboken only sufficient to put it into crates. It is, moreover, in proof that the sales take place on the same day as the poultry arrives in New York. We ignore such sales as take place in Hoboken, since they add no new feature to the case. So far as touches the point of interstate commerce, such a situation is precisely within Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, and Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, both of which concerned the shipment of live stock. It is equally within the decision of Binderup v. Pathé Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308. The defendant relies chiefly upon Hopkins v. U. S., 171 U. S. 578, 19 S. Ct. 40, 43 L. Ed. 290, and Anderson v. U. S., 171 U. S. 604, 19 S. Ct. 50, 43 L. Ed. 300.

It is quite possible that those cases would have been otherwise decided to-day; at any rate both in Swift v. U. S., supra, and Stafford v. Wallace, supra, they were distinguished by their especial circumstances. In Hopkins v. U. S., supra, the combination, which was held not directly to affect interstate commerce, was between the commission merchants only, who are the analogue here of the sellers' local agents. Besides, the combination only affected their internal affairs, though it did exclude outsiders. Whether an agreement between them fixing prices would even then have passed is certainly very doubtful, because in Anderson v. U. S., supra, where the combination was between the buyers, the court especially reserved the question whether it directly affected interstate commerce, and whether, had it fixed prices, it would have gone scathless. They held that a combination intended only to prevent competition of the "yard traders," who were free at any time to come in, was not forbidden by the Sherman Act even if it did affect interstate commerce.

The distinction between the direct or indirect effects of a combination is necessarily practical rather than ratiocinative. It is impossible to draw a line which shall be immune from casuistical attack, and perhaps it is unfortunate that the somewhat arbitrary and pragmatic nature of what courts do in such cases has been so frequently disguised by a show of deduction. Happily much has now been settled by past cases, and it seems to us unnecessary to do more than call attention to those which rule that at bar.

[2] In closing upon this point, we may add that the decisions upon the power of a state to tax commerce are not relevant here. The last authoritative exposition of that question is Sonneborn Bros. v. Cureton, 262 U. S. 506, 43 S. Ct. 643, 67 L. Ed. 1095, which, following Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382, Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257, Emert v. Missouri, 156 U. S. 296, 15 S. Ct. 367, 39 L. Ed. 430, and Kehrer v. Stewart, 197 U. S. 60, 25 S. Ct. 403, 49 L. Ed. 663, sustained the right of the state to tax goods or to levy an excise upon selling them, when they have once come to rest within the state, even in their unbroken packages. The test of the unbroken package was relegated to the case of imports. However, the power of a state to tax goods (so it be without discrimination), which have been brought from other states, is by no means the measure of the powers of Congress over interstate commerce. The point is neatly illustrated in the cases, among others, which concern the regulation of prices for natural gas. Thus in Missouri v. Kansas Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027, where the gas was delivered to wholesalers, the state might not act at all, while, when it is delivered direct to the consumers, it may, until Congress interfere. Pennsylvania Gas Co. v. Public Service Com., 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434. Perhaps, in the light of those cases, sales like those at bar are within the exclusive power of Congress in any event. But we need not go so far; by the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) Congress has exercised its fullest power over interstate commerce, and certainly such sales as these are within it.

[3] As to the second point, it is somewhat surprising at this day to hear it suggested that a frank agreement to fix prices and prevent competition as regards them among one-half the buyers in a given market may be defended, on the notion that the results are economically desirable. We should have supposed that, if one thing were definitely settled, it was that the Sherman Act forbade all agreements preventing competition in

price among a group of buyers, otherwise competitive, if they are numerous enough to affect the market. The suggestion is that, since Standard Oil Co. v. U. S., 221 U. S. 55, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, such a combination may be justified, if some prejudice to the public be not shown. That might be the law, but we do not so understand it.

In numerous instances since that case the Supreme Court has held that such a combination is unlawful of itself. Standard Sanitary Mfg. Co. v. U. S., 226 U. S. 20, 33 S. Ct. 9, 57 L. Ed. 107; Straus v. American Publishers Association, 231 U. S. 222, 34 S. Ct. 84, 58 L. Ed. 192, L. R. A. 1915A, 1099, Ann. Cas. 1915A, 369; U. S. v. Schrader's Sons, 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471; Frey & Son v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892; American Column Co. v. U. S., 257 U. S. 377, 42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093; U. S. v. American Oil Co., 262 U. S. 371, 43 S. Ct. 607, 67 L. Ed. 1035. In these cases there were, indeed, other unlawful elements; but an agreement fixing prices existed in all, and was always recognized as one ground for relief. Indeed, many of them were cases where the manufacturer of a product in which he had a natural or legal monopoly attempted to control its resale prices, a weaker case than this at bar. Perhaps the court went farther in American Column Co. v. U. S., supra, than at any other time, to find a sinister interpretation in a trade practice which at least on its face was innocent and beneficent. Because the means of information there exchanged was thought to be a covert plan for fixing prices the whole system went by the board. Nothing could be more striking evidence of the lengths to which the court will go to discover and forbid what here is avowed. Among those trade practices which fall within the statute, none we think is more typical than an agreement of a substantial number of either buyers or sellers to fix the price at which alone all members of the group will trade.

With the wisdom of such a policy we have, of course, nothing to do. It may well be that such an association as this may use its power to the benefit of the trade at large. Bids made at random, with inadequate information of the supply and of the wants of consumers, may not in the end protect either the producer or the consumer as well as when representatives of each side meet with full knowledge of the factors which will in the long run control average prices. It is, however, obvious from the long history of this act, in the courts and outside, that Congress deliberately prefers unorganized individualism in bargaining to the danger, real or fancied, which may attend any efforts to control it by concerted efforts.

[4] In conclusion, we notice that there is a genuine question of fact about the existence of any "boycott," properly speaking, except as it is directed against members of the association who do not keep to its prices. As to others, the defendants insist that the order should not remain. However, in cases of injunctions pendente lite, while the plaintiff's right must be beyond dispute, when the question is of the probability that the defendant will violate that right, we are not so sensitive. In the case at bar, some injunction against boycotting was justified. If it goes farther than the uncontested proof warrants, it can do the defendants no hurt, while, if they purpose what is forbidden, it will be proper.

Order affirmed, with costs.