**UNITED STATES v. APPALACHIAN COALS, Inc., et al.**

**No. I.**

District Court, W. D. Virginia.

Oct. 3, 1932.

John Lord O'Brian, Asst. to Atty. Gen., Charles H. Weston, Russell Hardy, W. B. Watson Snyder, and Hammond E. Chaffetz, Sp. Assts. to Atty. Gen., for the United States.

William J. Donovan, of Washington, D. C., Edgar L. Greever, of Tazewell, Va., Horace R. Lamb, and Ralstone R. Irvine, both of Washington, D. C., and Otto C. Doering, Jr., of New York City, for defendants.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is a petition for an injunction under section 4 of the Sherman Anti-Trust Act of July 2, 1890 (15 USCA § 4), heard before a special court of the three Circuit Judges of the circuit as provided by 15 USCA § 28. The complainant is the United States and the defendants are 137 producers of bituminous coal operating in the states of Virginia, West Virginia, Kentucky, and Tennessee and a coal selling agency which they have organized. It is alleged that the plan by which this agency is given the exclusive right to sell the coal produced by the defendants and to fix the prices at which same shall be sold is in violation of sections 1 and 2 of the Sherman Anti-Trust Act (15 USCA §§ 1, 2). Much testimony has been taken which is covered by a detailed finding of facts which we are filing herewith. In this opinion we shall state only such of the facts as are necessary to an understanding of the application which we make of the controlling principles of law.

The defendant producers, 137 in number, are engaged in the mining of bituminous coal in eight coal-producing districts of Virginia, West Virginia, Tennessee, and Kentucky, extending over twenty-four counties of these states. This territory embraces a large part of the Southern Appalachian coal field; and, as it is the territory from which the coal to be sold by Appalachian Coals, Inc., the selling agency, is produced, we shall for convenience refer to it hereafter as the Appalachian territory. Defendant producers mine the greater part of the coal mined in this territory and a very substantial part of all the high volatile coal mined in the United States. In 1929, the last year for which complete figures are available, the total production of bituminous coal east of the Mississippi river was 484,786,000 tons. In the Appalachian and immediately surrounding territory, the production was 107,008,209 tons. Of this amount 58,011,367 tons were produced by the 137 defendants, 20,541,841 tons by nondefendant producers in the same territory, 16,455,001 by captive mines, that is, mines operated to produce coal chiefly for the consumption of the owners, and 12,000,000 tons by mines in the immediately surrounding territory. It will thus be seen that the production controlled by the defendants was 11.96 per cent. of the production east of the Mississippi, 54.21 per cent. of the total production of the Appalachian and immediately surrounding territory, including that of captive mines, 64

per cent. of the production of the Appalachian and immediately surrounding territory, not including captive mines, and 74.4 per cent. of that part of the product of the Appalachian territory proper which is sold commercially.

The cost of transportation narrows the market in which coal can be sold profitably; and the market of coal produced in the Appalachian territory is not the entire United States, but the sections of the country which are accessible under existing costs of transportation. A study of the figures for rail shipments in the year 1929 shows that the coal produced in the Appalachian and immediately surrounding territory was an important factor in the markets mentioned in the following table, which covers all of the important markets in which Appalachian coal is sold.[1] Its relative importance in these markets may be seen at a glance by comparing the shipments from Appalachian and surrounding territory, set forth in the second column, with the total rail shipments into the markets, set forth in the first. The percentage is shown in the third.

| Market | Total rail shipments into Market | Rail shipments from Appalachian territory | Percentage of Appalachian to total |
|---|---|---|---|
| Virginia | 4,880,098 | 1,628,500 | 33.4 |
| West Virginia | 4,428,463 | 978,769 | 22.1 |
| Kentucky | 4,191,675 | 2,782,026 | 66.4 |
| Tennessee | 5,582,419 | 3,228,952 | 57.8 |
| North Carolina | 3,215,337 | 2,197,545 | 68.3 |
| South Carolina | 2,400,025 | 2,295,476 | 96. |
| Georgia | 3,024,614 | 2,541,533 | 84. |
| Ohio | 45,847,236 | 15,941,414 | 34.8 |
| Indiana other than Chicago District | 14,632,580 | 6,484,157 | 44.3 |
| Illinois other than Chicago District | 19,230,660 | 1,850,215 | 9.6 |
| Chicago District | 32,254,255 | 7,429,543 | 23. |
| Southern Michigan Peninsula | 19,947,446 | 14,522,291 | 72.8 |
| Lake Cargo | 39,204,835 | 17,172,446 | 43.8 |
| Tidewater between N. Y. and Hampton Roads | 7,202,877 | 717,900 | 10. |
| Tidewater to N. Y. | 14,407,000 | 1,317,000 | 9. |
| Tidewater to New England | 14,445,000 | 2,540,000 | 17.6 |

We need not go into the figures as to what part of the shipments from Appalachian territory shown above represents coal sold by the defendants. The fact that they mine 54 per cent. of the coal produced in the Appalachian and surrounding territory is sufficient proof of the important part

[1] See Defendants' Exhibit 1, table 6, and Defendants' Exhibit 9. (Not to be published per court.)

which their coal plays in these markets. It is apparent, without further elaboration, that they control, not only a substantial part of the production in the field in which they operate, but also a substantial part of the coal sold in the markets in which they compete.

Appalachian Coals, Inc., is a coal-selling agency organized by the 137 producing defendants to sell the coal which they produce. They own the agency's entire capital stock, which is apportioned among them in proportion to their productive capacity. By contracts which they have executed with the agency, the latter is given the exclusive right, not only to sell all the coal which they produce, but also to fix the prices at which same shall be sold. Orders for coal obtained by the agency are to be apportioned among them in the event that it is not possible to sell their entire production. The agency is to receive a commission of 10 per cent. for making sales and is to guarantee accounts. Subagents are to be appointed by the agency, and are to receive 8 per cent. on sales from the commission allowed the agency. Any stockholding producer may direct the appointment of subagents to sell the product of his mines for the agency and any stockholder not exercising this privilege is required to subscribe to a larger percentage of the preferred stock of the agency. Subagents are to sell the coal of the producer at whose instance they are appointed; and, notwithstanding the agreement as to prorating orders, it is understood that coal sold to be delivered by a certain producer is to be delivered by him. It does not appear with certainty how this is to be reconciled with the agreement for prorating; but it is certain that no producer is to sell except through the agency, and that the agency is to fix the prices at which all sales are to be made.

The prices at which coal is to be sold are to be fixed by a board composed of the president and the vice presidents of the agency. This board is to stay at the central office of the agency and is to fix prices from time to time at which the coal of defendants is to be offered; and it is contemplated that prices are to be fixed with reference to the market price of coal so as to sell as nearly as possible all the coal that defendants can produce and to secure for same the highest prices obtainable. No contract for delivery exceeding sixty days in the future is to be binding upon any producer unless he agrees to it; but, with this exception, the agency

is to have the power to close contracts at whatever price it may fix.

This selling agency has not yet begun to operate. It was organized early in the year 1932, and contracts were entered into with the producing defendants continuing until April 1, 1935, and thereafter from year to year. Before defendants began operating through the agency, however, they called the attention of the Department of Justice to what they were proposing to do. Although, for the reasons hereafter stated, we think the plan violative of the Sherman Act, it is but due to defendants to say that the evidence in the case clearly shows that they have been acting fairly and openly, in an attempt to organize the coal industry and to relieve the deplorable conditions resulting from overexpansion, destructive competition, wasteful trade practices, and the inroads of competing industries.

The evidence before us discloses that the condition of the coal industry for many years has been indeed deplorable. During the World War, and for a short while thereafter, conditions led to an overdevelopment of mine capacity, with the result that, to meet a demand of less than 500,000,000 tons, the bituminous mines of the country have a developed capacity exceeding 700,000,000 tons. In addition to this, the demand, which formerly doubled every decade, has been seriously affected as the result of more efficient methods in the burning of coal and the increasing use of hydroelectric current and of substitute fuels, such as petroleum and natural gas. Competition within the industry has become very fierce, being based in many instances, not upon the conditions of the trade, but upon the necessities of the producer. The increase in the screening of coal, which the efficient use of coal has developed in recent years, has added to the troubles of the producer, as it results in coal of sizes which have not been sold being loaded in railroad cars at the same time as sizes that have been sold. This unsold coal tends to clog the yards and shut down the mines. If shipped out to clear the yards, it will go on demurrage if not sold promptly, and must then be sold as "distress" coal for any price obtainable. Another practice which has added to the troubles of the producer is the offering of the same coal through different sales agents, a practice which results in fictitious pyramiding of supply with resulting depression of the market. Other hurtful practices have developed which, with the overexpansion of productive capacity and the inroads of competing industries, have resulted in great loss to producers, in bankruptcy and ruin to many of them, in the lowering of wages, and in great suffering to communities whose means of livelihood is dependent upon coal production.

There has been much effort on the part of public authorities, as well as on the part of coal producers, to remedy these unsatisfactory conditions in the coal trade. Conferences of producers have been called by the Governors of states, limitation of production by state law has been proposed, and bills for production under federal license, with fixing of prices by a coal commission, have been introduced into Congress. In the fall of 1931 meetings of the coal producers of the United States were held to consider the situation; and, as a result of these meetings, the plan of regional coal-selling agencies was evolved, each agency to handle the coal produced in a field characterized by common competitive conditions. Appalachian Coals, Inc., is the only agency which, so far, has been organized pursuant to this plan; but it appears from the testimony that the organization of similar agencies is contemplated in a number of other fields if the plan here involved is held to be lawful.

It is argued in defense of such agencies that their purpose is not to restrain trade but to promote it; that they undertake not to limit the production of any producer but to sell his production; that they will eliminate wasteful and ruinous practices such as the dumping of no-bill coal and pyramiding; that they will reduce selling costs; that they will promote more efficient and correct grading; that they will conduct scientific investigation which will result in the more efficient and more extensive use of coal; that they will be able to carry on, and will carry on, more effective advertising and selling campaigns; that they will be better able to meet the competition of petroleum, natural gas, and water power; and that they will furnish as among themselves more intelligent and more effective competition—competition based upon an intelligent view of market conditions and not upon the necessities of the individual producers. With respect to the elimination of competition, it is said that only the cut-throat price competition among the individual members will be eliminated, and that there will remain competition between different grades of coal and competition among the members even as to price, as the various producers will bring pressure upon the organzation to fix prices at which

their coal can be moved. It is said, also, that the agency will be powerless to fix the market price of coal because of the competition of other selling agencies and of outside producers, who control a substantial part of the actual output and a larger part of the productive capacity of the district.

The arguments thus made are impressive, but an examination of the cases decided under the Sherman Act will show that they are typical of the arguments made in favor of co-operation as distinguished from that free competition which it was the purpose of the act to preserve. After all of the benefits for which defendants argue have been considered and given due weight, there is no escaping three outstanding facts: (1) That their plan will necessarily eliminate competition as to price between the producers who are members of the organization; (2) that the prices at which their coal will be offered for sale will be fixed by the selling agency which represents all of them; and (3) that, although the agency will not be able to fix market prices or establish monopoly control in the markets in which it sells, the volume of coal which it will handle is so great that the elimination of competition among those who produce it, and the power to fix uniform prices at which it will be offered for sale, must necessarily affect market prices. It is said that this elimination of competition and any consequent effect on prices is but incidental to the proper purposes of the organization, as in the case of the U. S. Steel Corporation or the International Harvester Company. But it is clear, we think, that these are not incidental, but are the very crux of the plan. It is upon the elimination of competition among the individual producers and the unified control given in offering their product upon the market that the whole plan is predicated. And, while the influence upon the market of a large individual producer may properly be said to be incidental to the volume of its product, it is clear that the influence upon the market of such a combination as that with which we are dealing would result solely from the combination itself.

■ The question which thus arises for our consideration is whether an organization of producers engaged in interstate commerce, who have not through this organization obtained monopoly control of the market, but who control a substantial part of the product sold therein, is violative of the antitrust act, where it appears that such organization eliminates competition among the member producers and is clothed with power to fix prices at which sales will be made by them. To answer this question we must give consideration to the provision of the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209 [15 USCA §§ 1–7]), the history[2] of that enactment and the decisions interpreting it. Its applicable provisions are as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Section 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 USCA §§ 1, 2.

■ The primary purposes of this enactment was to guard against monopolization of industry and the suppression of free competition. In England our ancestors had struggled with monopolies granted by the crown; but from the beginning of our national existence we had accepted the laissez faire doctrine of unrestricted competition for the relationship between the state and industry. Competition was relied upon to hold prices within a reasonable range of the cost of production and to insure the investment of the social capital in enterprises reasonably profitable. But during the 70's and 80's the unrestricted competition of laissez faire was in a fair way of destroying itself. Ruthless and unfair competition had led to the creation of gigantic enterprises which were able to crush competitors and obtain a monop-

---

[2] For history of the act and interesting comments on the leading decisions under it, see Jaffe and Tobriner "The Legality of Price Fixing Agreements," 45 Harvard Law Review, 1164; Robert L. Raymond "The Federal Anti-Trust Act," 23 Harvard Law Review, 353, and "Standard Oil and Tobacco Cases," 25 Harvard Law Review, 31.

olistic control over trade; and it was feared that the evils which had been experienced from government monopolies were to be expected from them. It was thought that they would result in lowering the efficiency of industry and in the exaction of unfair prices, fixed, not with relation to the cost·of production, but with a view of obtaining the maximum monopoly revenue. And there was fear that the wealth of the country would be concentrated in the hands of a few, with want and economic serfdom on the part of the many. It was thought, also, that the remedies of the common law could not be invoked to curb or punish restraints or monopolization of trade occurring in interstate commerce; and so the Sherman Act was passed to guard such commerce from monopolization and to preserve the regulative force of the free play of competition.

It will be observed that the act itself draws no distinction between loose combinations resulting from agreements between independent dealers and the combination which results from normal corporate organization. It is clear, however, that the distinction must be drawn when the rule of reason laid down by the Supreme Court is applied; and much confusion in thought has resulted from failure to draw it. While monopolization or attempt to monopolize or unreasonably restrain trade is a violation of the act whether resorted to by a single corporate organization or ·by agreement between independent dealers, mere size is not a violation, and the elimination of competition incidental to normal corporate organization is not to be condemned. Attempts to obtain monopoly control, to eliminate competition, or to effect any other undue restraint of trade, are condemned whatever the form which the attempt may take; and agreements between independent dealers, the purpose or effect of which is to eliminate competition among themselves and fix common selling prices, unquestionably restrain trade, and they are condemned as unreasonable restraints because tending toward the evil of monopoly control. The philosophy underlying the distinction is well stated by the late Judge Rose in United States v. American Can Co. (D. C.) 230 F. 859, 902, as follows: "The problem presented by size and power is one of such far-reaching difficulty that Congress has said, while it does not see how to deal with them when acquired in the legitimate expansion of a lawful business, it will prevent their illegitimate and unnatural acquirement by any attempt to restrain trade

or monopolize industry. Perhaps the framers of the Anti-Trust Act believed that, if such illegitimate attempts were effectively prevented, the occasions on which it would become necessary to deal with size and power otherwise brought about would be so few and so long postponed that it might never be necessary to deal with them at all."

For a considerable period after the passage of the act, the view was widely entertained that it forbade all restraints of trade resulting from agreements between independents, but had no application to corporate organizations. The Supreme Court in the Northern Securities Case, 193 U. S. 197, 24 S. Ct. 436, 48 L. Ed. 679, however, applied it to the case of a holding company which took over the controlling interest in the capital stock of two competing railroads. The question which then arose in the public mind was whether the effect of this decision would not be to throttle the growth of industry in the United States. Purchase of the business of competitors was a normal incident in the growth of business; and, if an organization was to be condemned because of the combination resulting from the acquirement of a competing business, an effective obstacle to normal growth and development was interposed. This question was answered in Standard Oil Co. of New Jersey v. U. S., 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and American Tobacco Co. v. U. S., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663. In these the Supreme Court laid down the celebrated "Rule of Reason," holding that only acts, contracts, agreements, or combinations which operated to the prejudice of the public interest, by unduly restricting competition or the due course of trade, were forbidden by the act.

This rule of reason, as it applies to corporate organization, has been clarified in the later cases of U. S. v. U. S. Steel Corporation, 251 U. S. 417, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121, and U. S. v. International Harvester Co., 274 U. S. 693, 47 S. Ct. 748, 753, 71 L. Ed. 1302, which hold that mere size or unexerted power on the part of a corporation does not constitute a violation of the act. Corporate organization to be condemned must be exercising, or attempting to exercise, monopolistic control over the market, or attempting to unreasonably restrain trade by the elimination of competition or otherwise. In the International Harvester Case, the Supreme Court, after commenting on the fact that the Har-

vester Company had not attempted to dominate the industry by the compulsory regulation of prices, although its prices had been followed by many of its competitors, said:

"The law, however, does not make the mere size of a corporation, however impressive, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its power. United States v. U. S. Steel Corporation, 251 U. S. 417, 451, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121. And the fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another · manufacturer, does not establish any suppression of competition or show any sinister domination. United States v. U. S. Steel Corporation, supra, 448 of 251 U. S., 40 S. Ct. 293." ·

The contention of defendants is that the rule of the U. S. Steel Corp. and International Harvester Co. Cases should be applied to their selling agency, and that, as it has not acquired and is not seeking to acquire the power of monopolistic control over prices, or to eliminate competitors, it ought not be held a combination in unreasonable restraint of trade. They contend that the law should recognize no distinction between corporate organizations, such as the Steel Corporation or the International Harvester Company, and combinations such as their selling agency, resulting from agreements between independent dealers; and that the latter, just as the former, ought not be held violative of the statute, unless resulting in monopolistic control of the market, or unless accompanied by unfair practices for eliminating competitors or a purpose to achieve monopolistic control or to affect prices by the elimination of competition. There is a vital distinction in principle, however, between a bona fide corporate organization resulting from normal growth and development and an agreement eliminating competition between independent dealers; and the distinction is so clearly recognized in recent decisions of the Supreme Court that we have no choice but to follow them.

Corporate organization is ordinarily the product of natural economic forces; and, so long as there is no intention to monopolize and no attempt to exercise monopolistic control of the market or unreasonably to restrain trade, there is no substantial danger of injury to the public or reason for interference by the state. Such organizations have grown large ordinarily because the economic law of increasing returns is operative—because internal economies and the elimination of duplication and waste make operation on a large scale more profitable than in small units. So long as no unfair practices are adopted for the purpose of eliminating competitors, competition either actual or potential can be depended upon to hold prices within a range that is fair, and the public will not suffer as a result of the organization. In addition to this, there is the practical consideration that, where a corporation has grown large by natural processes, even though absorption of competitors be involved, it is almost a matter of impossibility to dissolve it without injury to the public interest. No method of "unscrambling eggs" has as yet been discovered.

Combinations of independent producers, on the other hand, organized to fix uniform prices for the sale of their products or to eliminate competition among themselves, are artificial agreements designed to limit the operation of natural economic laws—to eliminate the competition between dealers, upon which, as we have seen, the public relies for the maintenance of reasonable prices, efficient operation of industry, and economical investment of capital. As pointed out by Judge Rose in the American Can Company Case, supra, they are forbidden because of their tendency toward monopolistic control. In dealing with such combinations, moreover, the courts face no such difficulties as in dealing with corporate organization where the fusion of interests has become a fact accomplished. The free competition which it is the policy of the law to promote can be restored by the simple expedient of forbidding the independent dealers to operate under their agreement.

This is not to hold that the rule of reason has no application to such loose combinations. We think that it does apply to them, and that in its application they will not be condemned where they have no intent to eliminate competition or affect prices and control no substantial part of the trade in their market. An exclusive selling agency, for instance, would not be condemned, in the absence of an actual intent to eliminate competition and affect prices, if it represented only a few producers and was without power to that end. Where the parties to such a combination control a substantial portion of the trade, however, the unified control arising from such combination will necessarily affect prices, not only as a result of the elimination of competition between the members themselves, but also because

of the position of leadership and influence in the trade which the combination will acquire. Consequently, it is uniformly held that, where a number of dealers control a substantial part of the trade in a market, any agreement to eliminate competition among themselves or to fix uniform prices is per se unreasonable and contrary to the statute.

Before the decisions in the Standard Oil Co. and American Tobacco Co. Cases were rendered, the Supreme Court had held that contracts to eliminate competition through price-fixing agreements were violative of the act, without regard to whether competition was entirely suppressed or monopoly control of the market attained. U. S. v. Trans-Missouri Freight Association, 166 U. S. 290, 17 S. Ct. 540, 41 L. Ed. 1007; U. S. v. Joint Traffic Association, 171 U. S. 505, 19 S. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 S. Ct. 96, 108, 44 L. Ed. 136; Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502. The Addyston Pipe & Steel Company Case involved an agreement by six manufacturers of cast iron not to compete with each other in bidding upon contracts. In this case the court said:

"Total suppression of the trade in the commodity is not necessary in order to render the combination one in restraint of trade. It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded."

An examination of the opinion rendered in this case in the Circuit Court of Appeals (U. S. v. Addyston Pipe & Steel Co. (C. C. A. 6th) 85 F. 271, 46 L. R. A. 122), where it was heard before Justice Harlan and Judges Taft and Lurton, shows that, so far as it affected the question as to whether the stifling of competition between competing dealers was to be held a violation of the act notwithstanding effective outside competition, it is very similar to the case at bar. Judge Taft thus stated the argument for the defendants in that case (85 F. 279):

"The argument for defendants is that their contract of association was not, and could not be, a monopoly, because their aggregate tonnage capacity did not exceed 30 per cent. of the total tonnage capacity of the country; that the restraints upon the members of the association, if restraints they could be called, did not embrace all the

states, and were not unlimited in space; that such partial restraints were justified and upheld at common law if reasonable, and only proportioned to the necessary protection of the parties; that in this case the partial restraints were reasonable, because without them each member would be subjected to ruinous competition by the other, and did not exceed in degree of stringency or scope what was necessary to protect the parties in securing prices for their product that were fair and reasonable to themselves and the public; *that competition was not stifled by the association because the prices fixed by it had to be fixed with reference to the very active competition of pipe companies which were not members of the association, and which had more than double the defendants' capacity; that in this way the association only modified and restrained the evils of ruinous competition, while the public had all the benefit from competition which public policy demanded."* (Italics ours.)

After a most comprehensive review of the authorities, the court rejected this argument, holding that such an agreement was unreasonable at common law because of its restraint of free competition and its *tendency* towards monopoly, saying: "Upon this review of the law and the authorities, we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly."

That the rule condemning contracts to eliminate competition between independent dealers through price-fixing agreements was not modified by the Standard Oil Co. and American Tobacco Co. Cases was made clear in the case of United States v. Union Pacific R. R., 226 U. S. 61, 33 S. Ct. 53, 56, 57 L. Ed. 124, decided shortly afterwards. In that case the court quoted with approval the following passage from the opinion of Mr. Justice Harlan in the Northern Securities Case: "In all the prior cases in this court the antitrust act has been construed as forbidding any combination which, by its necessary operation, destroys or restricts free competition among those engaged in interstate commerce; in other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce. Now, can this court say that such a rule is prohibited by

the Constitution, or is not one that Congress could appropriately prescribe when exerting its power under the commerce clause of the Constitution? Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine."

And referring to the decision in the Standard Oil Co. and American Tobacco Co. Cases, the court said: "In the recent discussion of the history and meaning of the act in the Standard Oil and Tobacco Cases this court declared that the statute should be given a reasonable construction, with a view to reaching those undue restraints of interstate trade which are intended to be prohibited and punished; and in those cases it is clearly stated that the decisions in the former cases had been made upon an application of that rule, and there was no suggestion that they had not been correctly decided."

More recent cases in the Supreme Court have enforced and clarified the rule and leave no doubt as to its application to the case at bar. The case of American Column & Lumber Company v. United States, 257 U. S. 377, 42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093, involved the so-called "open competition agreement." The defendants were manufacturers of hardwood who controlled only 5 per cent. of the hardwood mills and about one-third of the hardwood production of the United States. They were combined in a trade association which furnished statistics to its members as to production and supplies on hand, together with statements as to prices charged by the various members and predictions as to future market prices. Notwithstanding the absence of any agreement not to compete with each other or to observe uniform prices, the court held the plan violative of the statute because of its tendency toward the elimination of competition and the adoption of such prices. The language of the opinion leaves no doubt that any arrangement restricting free competition or restraining the natural flow of trade in interstate commerce is unreasonable and condemned by the statute. The court said at page 400 of 257 U. S., 42 S. Ct. 114, 117:

"It has been repeatedly held by this court that the purpose of the statute is to maintain free competition in interstate commerce and that any concerted action by any combination of men or corporations to cause, or which in fact does cause, direct and undue restraint of competition in such commerce, falls within the condemnation of the act and is unlawful.

"In Northern Securities Co. v. United States, 193 U. S. 197, 337, 24 S. Ct. 436, 457, 48 L. Ed. 679, it is declared that:

" 'In all the prior cases in this court the Anti-Trust Act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in other words that to destroy or restrict free competition in interstate commerce was to restrain such commerce.'

"In United States v. Union Pacific R. Co., 226 U. S. 61, 87, 33 S. Ct. 53, 58, 57 L. Ed. 124, decided in 1912, long prior to the forming of their combination by the defendants, the law was condensed into this expression:

" 'To preserve from undue restraint the free action of competition in interstate commerce was the purpose which controlled congress in enacting this statute, and the courts should construe the law with a view to effecting the object of its enactment.'

"And in Eastern States Retail Lumber Dealers' Association v. United States, 234 U. S. 600, 609, 34 S. Ct. 951, 953, 58 L. Ed. 1490, L. R. A. 1915A, 788, it was said:

" 'It (the Sherman Act) broadly condemns all combinations · and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce.' "

Concerning the "plan" before the court, it was said: "Such close co-operation, between many persons, firms, and corporations controlling a large volume of interstate commerce, as is provided for in this Plan, is plainly in theory, as it proved to be in fact, inconsistent with that free and unrestricted trade which the statute contemplates shall be maintained. * * * Convinced, as we are, that the purpose and effect of the activities of the Open Competition· Plan, here under discussion, were to restrict competition, and thereby restrain interstate commerce in the manufacture and sale of hardwood lumber, by concerted action in curtailing. production and in increasing prices, we agree with the District Court [201 F. 581] that it constituted a combination and conspiracy in restraint of interstate commerce within the meaning of the Anti-Trust Act of 1890 (26 Stat. 209), and the decree of that court must be affirmed."

Certainly if an agreement is to be condemned, where there is no express fixing of prices or elimination of competition, merely because of the intention to this effect found to be back of it, an agreement expressly lim-

iting the right of independent dealers to sell in competition with each other, and delegating to a selling agency the right to fix prices at which sales are to be made, cannot upon any theory be sustained.

In United States v. American Linseed Oil Co., 262 U. S. 371, 43 S. Ct. 607, 611, 67 L. Ed. 1035, the open competition plan was again before the court. In again condemning it, the court said: "We are not called upon to say just when or how far competitors may reveal to each other the details of their affairs. In the absence of a purpose to monopolize, or the compulsion that results from contract or agreement, the· individual certainly may exercise great freedom; but concerted action through combination presents a wholly different problem, and is forbidden when the necessary tendency is to destroy the kind of competition to which the public has long looked for protection. The situation here questioned is wholly unlike an exchange, where dealers assemble and buy and sell openly, and the ordinary practice of reporting statistics to collectors stops far short of the practice which defendants adopted. Their manifest purpose was to defeat the Sherman Act, without subjecting themselves to its penalties."

In Cement Mfrs. Association v. United States, 268 U. S. 588, 604, 605, 45 S. Ct. 586, 592, 69 L. Ed. 1104, the court, in sustaining the validity of a trade association which merely collected and distributed trade data to its members, said: "Agreements or understanding among competitors for the maintenance of uniform prices are, of course, unlawful and may be enjoined."

Finally, in United States v. Trenton Potteries Co., 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700, 50 A. L. R. 989, the court dealt with an agreement, on the part of those controlling over 80 per cent. of the business of manufacturing and distributing sanitary pottery in the United States, to fix and maintain uniform prices. The trial court refused to charge the jury that to convict the defendants they must find that the agreement was an unreasonable restraint of trade and commerce, but charged that, if they found that the agreement was made as alleged, they should convict the defendants without regard to the reasonableness of the prices fixed or the good intentions of the combining units. This action was approved by the Supreme Court. The court said with respect to the purpose of the Sherman Act to maintain free competition (page 397 of 273 U. S., 47 S. Ct. 377, 379): "Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least, in the light of its effect on competition, for, whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it are based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition."

And with respect to price-fixing agreements it was said: "Beginning with United States v. Trans-Missouri Freight Association, supra, and United States v. Joint Traffic Association, 171 U. S. 505, 19 S. Ct. 25, 43 L. Ed. 259, where agreements for establishing reasonable and uniform freight rates by competing lines of railroad were held unlawful, it has since often been decided and always assumed that uniform price-fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman Law, despite the reasonableness of the particular prices agreed upon."

A case directly in point on the principle here under discussion, and one cited with approval by the Supreme Court in the Trenton Potteries Case, is Live Poultry Dealers' Association v. United States (C. C. A. 2d) 4 F. (2d) 840, 842, a decision by Judges Rogers, Hough, and Learned Hand. The combination there involved was one between buyers of live poultry in New York City. It appears that there were about 300 buyers of poultry in New York, and that about 178 of these joined the association. The members of the association appointed a committee of seven who were daily to treat with commission men, and after negotiation, with an eye on supply and demand, to establish a price for the day, which should obtain as to all purchases made by any member of the association. The reason given for the formation of the association was the demoralized condition of the market, "fake" or "wash" sales, frauds upon buyers, and the hope that by "stabilizing" prices there might be given buyers and sellers a reliable guide by which to deal and thus eliminate opportunities for bad trade practices. There was no suggestion that the association had the power of "monopoly control" over the market or that it could fix market prices. In holding the combination violative of the Sherman Act, the court, speaking through Judge Learned Hand, said: "As

to the second point, it is somewhat surprising at this day to hear it suggested that a frank agreement to fix prices and prevent competition as regards them among one-half the buyers in a given market may be defended, on the notion that the results are economically desirable. We should have supposed that, if one thing were definitely settled, it was that the Sherman Act forbade all agreements preventing competition in price among a group of buyers, otherwise competitive, if they are numerous enough to affect the market. The suggestion is that, since Standard Oil Co. v. U. S., 221 U. S. 55, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, such a combination may be justified, if some prejudice to the public be not shown. That might be the law, but we do not so understand it. * * * Among those trade practices which fall within the statute, none we think is more typical than an agreement of a substantial number of either buyers or sellers to fix the price at which alone all members of the group will trade."

There can be no question in the case at bar but that the defendants control, not only a substantial part of the coal produced in the field in which they operate, but also a substantial part of the coal sold in practically every market in which they sell. While there is substantial competition to be met in each market, and defendants will not through their sales agency be able to exercise monopolistic control of the market, it is clear that the control in the selling agency of the vast quantity of coal which they sell will necessarily affect prices. The selling agency will not be able, we think, to fix the market price of coal; but it is empowered to fix the price at which these producers will sell and to refuse to sell at offers less than that price, and this power must inevitably affect the market. We have, then, an organization of dealers controlling so substantial a part of the product sold in a market as to affect market prices. And we have an agreement among these dealers that they will not sell in the market except through a common agency, and will allow that agency to fix the prices at which sales may be made. This is clearly an agreement to eliminate competition and fix uniform prices by dealers controlling a substantial part of the trade, which, as we have seen under the authority of the cases cited, is forbidden by the Sherman Act.

A case almost on all fours with the case at bar is Chesapeake & Ohio Fuel Co. v. United States (C. C. A. 6th) 115 F. 610, 623, decided by Judges Lurton, Day, and Severens, with opinion by Judge Day, later of the Supreme Court. While the case was decided before the Supreme Court announced the "Rule of Reason" in the Standard Oil Co. and American Tobacco Co. Cases, it proceeded upon principles which, as we have seen above, were not affected by the decisions in those cases. Like the case at bar, it involved an exclusive selling agency with power to fix selling prices. Only fourteen coal companies were represented by the agency, and the amount of their production was only five thousand tons per day, or approximately a million and a half tons a year, as compared with more than fifty-eight million tons a year produced by these defendants. The same arguments were made there as here, viz. that the main purpose of the agreement was "to increase the trade of the parties, to enhance competition in a larger field and to improve the character of the product." These arguments were rejected, however, and the combination was held violative of the Sherman Act. With respect to the argument that the agency controlled so small a quantity of coal as not to affect prices, the court said:

"It is further contended that the competition is such in the market for which this coal is intended, and the coal produced by the operators, parties to this agreement, is such a small fraction of the quantity sold, that it cannot affect prices materially. It is not required, in order to violate this statute, that a monopoly be created. It is sufficient if that be the necessary tendency of the agreement. In U. S. v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325, Chief Justice Fuller said: 'Again, all the authorities agree that, in order to vitiate a contract or combination, it is not essential that its result be a complete monopoly. It is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from a free competition.' Quoted with approval in the Addyston Case, 175 U. S. 237, 20 S. Ct. 96, 44 L. Ed. 136.

"The statute is not limited to contracts or combinations which monopolize interstate commerce in any given commodity, but seeks to reach those which directly restrain or impair the freedom of interstate trade. The law reaches combinations which may fall short of complete control of a trade or business, and does not await the consolidation of many small combinations into the huge 'trust' which shall control the production and sale of a commodity."

What the court said with reference to a feature of the contract restricting the right

of the agency thus to purchase from others, if unable to pay the minimum price fixed by the committee of producers, i. e., if unable to sell the coal at the price fixed, is very pertinent here, when it is remembered that the contract here under consideration restricts the right of the producer to sell coal except through the agency. If the agency fails to sell it at the prices which have been fixed, his mines must remain idle; for he cannot sell except through the agency. The court said in this connection:

"Should the fuel company be unable in all cases to meet the price fixed, the parties are nevertheless prohibited, during the life of the contract, from dealing with others, or selling at a less price than the committee has fixed, and the purchaser is not at liberty to deal with competitors for a supply of coal for this market. 'It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity that is regarded.' The Addyston Case, 175 U. S. 245, 20 S. Ct. 109, 44 L. Ed. 149."

We have carefully examined the authorities upon which defendants rely, but we do not think that they are in point. The U. S. Steel Corporation Case and the International Harvester Company Case we have already distinguished. The Chicago Board of Trade Case, 246 U. S. 231, 38 S. Ct. 242, 62 L. Ed. 683, involved a reasonable regulation of the Board of Trade of Chicago to observe between the closing of the exchange on one day and its opening on the next the closing prices determined on the day in question by open competition on the exchange. The court held the restraint thus involved reasonable on the ground that it involved a restriction merely upon the period of price-making, had no appreciable effect upon market prices, applied during only a part of the business day and to a very small part of the day's sales, and within the narrow limits of its operation had helped to improve market conditions. It is manifest that what was decided there can have no application to a case such as this. Neither the National Association of Window Glass Manufacturers Case, 263 U. S. 403, 44 S. Ct. 148, 68 L. Ed. 358, nor the Maple Flooring Manufacturers Case, 268 U. S. 563, 45 S. Ct. 578, 592, 69 L. Ed. 1093, involved price-fixing or the elimination of competition. The former dealt with an agreement between manufacturers to operate their plants in such way as to utilize to best advantage a limited supply of hand labor; the latter, with an organization which gathered and disseminated statistical information for the benefit of its members, there being no evidence of any intention to fix uniform prices or eliminate competition.

■ For the reasons stated, we think it clear that the injunction prayed should issue. It is argued with much force that organization is essential to the preservation of the coal industry, one of the basic industries of the country, and that the organization can be effected only by means of some such arrangement as that embodied in the coal-selling agency before us; but this is an argument which addresses itself to the lawmaking branch of the government. Even if it be reasonable that organization be permitted because of the condition of the industry, it does not follow that the courts may uphold as reasonable an agreement or combination which the statute condemns. The argument of defendants goes, not to the reasonableness of the agreement as measured by the statute, but to the reasonableness of the statute itself. We sympathize with the plight of those engaged in the coal industry, whether as operators or as miners; but we have no option but to declare the law as we find it. We cannot repeal acts of Congress nor can we overrule decisions of the Supreme Court interpreting them.

If it be thought that the law should permit agreements eliminating competition as between the parties thereto and fixing as between them prices at which goods shall be sold, in cases where monopolistic control of the market is not intended and does not result, the remedy is with Congress and not with the courts.[3]

Decree will be entered enjoining defendants from proceeding further under their unlawful combination and from carrying out the contracts into which the producing defendants have entered with the defendant Appalachian Coals, Inc., in pursuance thereof.

Injunction granted.

SOPER, Circuit Judge (concurring).

The defendant coal producers take the view that their proposal is outside the scope of the Sherman Act because it involves a plan

---

[3] For recent articles dealing with proposed legislative changes in the Anti-Trust Act, see Jaffe and Tobriner, "The Legality of Price-Fixing Agreements," 45 H. L. R. 1164, 1192, and "Anti-Trust Laws and Self Regulation of Industry," by Professor John Dickinson, Journal of American Bar Association, vol. 18, p. 600.

to rescue a basic industry from disaster. They emphasize the fact that Appalachian Coals, Inc., their common sales agent, although empowered to fix the price of all the coal mined by them, would not be able to monopolize the market or exact exorbitant prices from the consuming public; and they contend that the activities of the organization would be so beneficial to the general welfare, that the restraint of trade incidentally involved could not be considered undue or unreasonable in the eye of the law. On this ground chiefly they seek to distinguish this case from such decisions involving trade organizations as American Column & Lumber Company v. United States, 257 U. S. 377, 42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093; United States v. American Linseed Oil Co., 262 U. S. 371, 43 S. Ct. 607, 67 L. Ed. 1035; United States v. Trenton Potteries Co., 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700, 50 A. L. R. 989; Live Poultry Dealers' Ass'n v. U. S. (C. C. A.) 4 F.(2d) 840.

The pronouncement of the courts that the Sherman Act was designed to forbid only unreasonable or undue restraints of trade has led to the contention that a restraint based on sound economic theory and devised in the interest of the general public is not within the prohibition of the statute; and this position finds increased support at a time like the present when productive capacity far exceeds buying power, and some restraint upon production seems desirable. We must regulate production, it is said, by some control, voluntary or governmental, with reference to the ability of the public to absorb the product; and in like manner we must hold prices above the cost of production so as to stabilize industry and insure a fair return to the capital and labor employed. So the defendants say that, since they are unable to conduct their business successfully under prevailing competitive conditions, they should be allowed to introduce a form of group control.

This argument confounds theories held in academic or business circles with the underlying purpose of the federal statutes. Economists themselves are not agreed as to whether these acts are suited to modern affairs. But, even if enlightened opinion were unanimous that each major industry should be conducted under a central control, governing the actions of individuals in such matters as price or production, our decision of necessity would be the same. What is a reasonable restraint of commerce may not be determined for us by private authority. Our view must con-

form to the recognized purpose of the present law that competition shall be free. The establishment of controls over production and price is the antithesis of this economy; and it is the province of Congress and not of the courts to decide which shall prevail.