## NATIONAL ASSOCIATION OF WINDOW GLASS MANUFACTURERS ET AL. v. UNITED STATES.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 353. Argued November 22, 23, 1923.—Decided December 10, 1923.

1. Whether an agreement between all the manufacturers of a commodity and a union representing all the labor obtainable for its manufacture, violates the Sherman Law, when it concerns only the way in which the labor shall be employed in production, and not sales or distribution, depends upon the particular facts. P. 411.
2. The manufacturers of hand-blown window glass,—an article costing twice as much to produce, but sold at the same price, as window glass made with the aid of machines, the price of the latter necessarily fixing the price of the former,—finding the supply of workmen in their industry insufficient to run their factories continuously during the working season, and being unable to run undermanned without serious loss, made an arrangement with the workmen, through their union, whereby, in effect, all the available labor was apportioned to part of the factories for part of the season and to the others for the remainder, so that all the workmen were secured the advantage of continuous employment through all the season, and each factory secured its share of labor for one period and closed down during the other. *Held,* not a combination in unreasonable restraint of trade, assuming that it might affect interstate commerce. P. 412.

287 Fed. 228, reversed.

APPEAL from a decree of the District Court which enjoined a combination of the appellants, at the suit of the United States, under the Sherman Law.

*Mr. John W. Davis,* with whom *Mr. Montgomery B. Angell* was on the brief, for National Association of Window Glass Manufacturers, appellant.

I. The wage scale agreement deals solely with manufacture, not with interstate commerce. Its effects upon

commerce, if any, are purely indirect and incidental. *United States* v. *Knight Co.*, 156 U. S. 1; *Anderson* v. *United States*, 171 U. S. 604; *United Mine Workers* v. *Coronado Co.*, 259 U. S. 344; *Hammer* v. *Dagenhart*, 247 U. S. 251; *Delaware, etc., R. R. Co.* v. *Yurkonis*, 238 U. S. 439; *Crescent Co.* v. *Mississippi*, 257 U. S. 129; *Gable* v. *Vonnegut Co.*, 274 Fed. 66; *Oliver Co.* v. *Lord*, 262 U. S. 172; *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245; *Kidd* v. *Pearson*, 128 U. S. 1. Where the subject matter of the contract or combination is sales of articles in interstate commerce, as in *Standard Sanitary Co.* v. *United States*, 226 U. S. 20; *Straus* v. *American Pub. Assn.*, 231 U. S. 222; *Eastern States Lumber Assn.* v. *United States*, 234 U. S. 600; *Addyston Co.* v. *United States*, 175 U. S. 211; *Swift & Co.* v. *United States*, 196 U. S. 375, the interstate commerce is directly affected; in fact, such was the end in view. *Loewe* v. *Lawlor*, 208 U. S. 274; *Duplex Co.* v. *Deering*, 254 U. S. 443; and *Montague & Co.* v. *Lowry*, 193 U. S. 38, are distinguishable.

II. The wage scale agreement is within those legitimate objects of labor unions which are exempted from the operation of the Sherman Act by the provisions of the Clayton Act. *Hitchman Co.* v. *Mitchell*, 245 U. S. 229; *National Fireproofing Co.* v. *Mason Builders' Assn.*, 169 Fed. 259; *Hopkins* v. *United States*, 171 U. S. 578.

III. The wage scale agreement, with its two-period system, if it can be said to relate to commerce at all, is not an undue or unreasonable restraint. *Standard Oil Co.* v. *United States*, 221 U. S. 1; *United States* v. *American Tobacco Co.*, 221 U. S. 106; *United States* v. *St. Louis Terminal*, 224 U. S. 383; *Standard Sanitary Co.* v. *United States*, 226 U. S. 20; *United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61; *United States* v. *Reading Co.*, 226 U. S. 324; *Nash* v. *United States*, 229 U. S. 373; *Eastern States Lumber Assn.* v. *United States*, 234 U. S. 600; *Chicago Board of Trade* v. *United States*, 246 U. S.

231; *United States* v. *U. S. Steel Corporation,* 251 U. S.
417; *United States* v. *Knight Co.,* 156 U. S. 1; *United
States* v. *Addyston Co.,* 85 Fed. 271; *Anderson* v. *United
States,* 171 U. S. 604; *Swift & Co.* v. *United States,* 196
U. S. 375; *United Mine Workers* v. *Coronado Coal Co.,*
259 U. S. 344.

*Mr. Solicitor General Beck,* with whom *Mr. Robert P.
Reeder,* Special Assistant to the Attorney General, was on
the brief, for the United States.

I. The restraint is for an unlawful purpose. No more
complete or indefensible monopoly was ever established
in any anti-trust case. It controls substantially all of
the hand-blown glass industry—a necessary material in
the building industry.

The exigencies of the war required the Government to
make a partial restriction in the production of glass, but
when the war had ended the exigency passed. Unfor-
tunately in that period of restriction both manufacturers
and the employees in this industry temporarily realized
the advantages to them of limiting production. On the
one hand, the manufacturers found that if production
could be restricted below the demand of the public, the
question of price was in their control and, thus basing
an artificial price upon an artificial scarcity, they believed
that they could make more money on a lessened pro-
duction than if they met the demands of the market.
Similarly, those who controlled the glass workers' union
erroneously believed that a compulsory restriction of pro-
duction would increase the demand for the product and
therefore the wages of labor. To centralize power, the
constitution of the union was interpreted as a virtual
power of attorney to the wage committee to act as it
pleased, without respect to the wishes of the members
of the union. No other committee or officer had any
authority in the matter, except that, after the wage agree-

ment was made, the executive board applied it to each manufacturer by allotting to him the first or second period, or both, if he were willing to operate two distinct plants. Even a referendum to the members of the union was powerless to overrule the arbitrary action of the wage committee.

II. The restraint has been imposed against the wishes of many of the manufacturers and of a large majority of the workers.

Both employer and employee were denied any freedom of action. No free labor market existed. The union had surrounded the industry with a wall, that no one could surmount. No manufacturer could operate without the consent of the union. The whole industry, employer and employee alike, only existed by the sufferance of a wage committee.

If it be true, as is claimed, that this alleged " dying industry " can not survive without the restrictions in question, then it is intolerable that the public should pay on capital expenditure for a whole year and only get in return a very restricted production of eighteen weeks. Such a proposition is economically indefensible. That such is not the case is clearly indicated by the fact that, until the industry was put on half-time during the war, it not only survived but, measured by the number of employees, was growing.

The testimony shows that hand-made glass is better in quality than machine glass, and presumably there will always be a market for the better quality. It is, however, unnecessary to theorize on this subject. The law of competition requires that the ability of any industry to survive should be put to the practical and unrestricted test.

The Government made little of the question of prices, for another indefensible feature of this monopoly was that there was no competition even in sales. The testimony

of the manufacturers themselves was that, having orig-
inally pooled their sales through a common selling agency,
they subsequently and apparently by concerted action
sold at the price fixed by the leading factory in the ma-
chine glass industry. Thus there was as little competi-
tion in selling price as there was in production.

III. The existing deficiency in the labor supply is not
natural but is due to restrictions imposed upon those who
wish to work in the industry. The record discloses that
the great reduction in the number of workers has occurred
since the installation of the two-period system and that
a large majority of the members of the union are opposed
to that system.

The shortage of labor was also due to the restrictions
upon the manufacturers in the securing of the necessary
workers.

IV. The plan restrains interstate commerce. The ac-
tions of this union, in agreeing or refusing to agree with
separate manufacturers were steps in the execution of
an illegal plan upon which there had been an earlier agree-
ment or understanding between the manufacturers' asso-
ciation and the union. The manufacturers' association
comprised the major portion of the manufacturers of
hand-blown window glass, and controlled all, and the
union comprised substantially all of the workers in the
industry. It was alleged and proved that a large portion
of the glass manufactured was shipped in interstate com-
merce, that dealers in the glass were not able to fill all
of their orders for interstate shipment, and that interstate
commerce was very materially restrained by the severe
time limits which were imposed by virtue of the agree-
ment between the manufacturers' association and the
union. The restraint was not merely minor and inci-
dental, but great and intentional. Distinguishing: *United
States* v. *Knight Co.,* 156 U. S. 1; *United Mine Workers* v.
*Coronado Co.,* 259 U. S. 344; *American Column Co.* v.

*United States,* 257 U. S. 377; *United States* v. *Reading Co.,* 226 U. S. 324; *Nash* v. *United States,* 229 U. S. 373; *Ramsay Co.* v. *Associated Bill Posters,* 260 U. S. 501; *United States* v. *American Oil Co.,* 262 U. S. 371.

V. The Clayton Act does not exempt the agreements involved from the anti-trust laws. *United Mine Workers* v. *Coronado Co.,* 259 U. S. 344.

Just as this Court has held that, while owners of patents and copyrights possess special privileges, they cannot go beyond those privileges and limit resale prices without violating the Anti-Trust Act (*Standard Sanitary Co.* v. *United States,* 226 U. S. 20; see also *Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 273; *Boston Store* v. *American Graphophone Co.,* 246 U. S. 8), so, also, it has held that, while workers may organize to attain the normal and "legitimate" objects of a labor organization, they may not so extend the activities protected under § 6 of the Clayton Act as to defeat the general purposes of the anti-trust laws. *Duplex Co.* v. *Deering,* 254 U. S. 443.

The Government does not contend that the National Window Glass Workers is in itself an illegal combination. It challenges simply one provision of the agreement or understanding between the union and the National Association of Window Glass Manufacturers, and the subsequent proceedings in execution of that portion of the agreement.

VI. The intentions of the defendants when thus restraining interstate commerce are immaterial. *Addyston Co.* v. *United States,* 175 U. S. 211; *United States* v. *Patten,* 226 U. S. 525; *United States* v. *Reading Co.,* 226 U. S. 324; *Standard Sanitary Co.* v. *United States,* 226 U. S. 20; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106.

VII. The agreement shows on its face that it constitutes a restraint of trade in violation of the Anti-Trust Act. Under this agreement every manufacturer of hand-

blown window glass in the United States is required to keep his plant closed two-thirds of the year, no matter how great may be the demand for glass in the building industry, no matter how eager he may be to manufacture or how earnestly the men in his plant may wish to continue in his employ. *Addyston Co.* v. *United States,* 175 U. S. 211.

*Mr. Pierre A. White,* with whom *Mr. I. L. Bradwin, Mr. R. M. Calfee* and *Mr. A. O. Dickey* were on the brief, for National Window Glass Workers et al., appellants.

I. The wage scale under attack has not curtailed or in any way lessened the production of hand-blown window glass, and has, therefore, not restrained trade. *Nash* v. *United States,* 229 U. S. 373.

II. The creation of the two-period plan is a reasonable and necessary regulation; it is the legitimate outgrowth of the peculiar business conditions confronting the industry. *United States* v. *Reardon,* 191 Fed. 454; 6 R. C. L. 789; *Nash* v. *United States, supra; Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106; *United States* v. *St. Louis Terminal,* 224 U. S. 383; *Standard Sanitary Co.* v. *United States,* 226 U. S. 20; *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61; *United States* v. *Reading Co.,* 226 U. S. 324; 183 Fed. 427; *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600; *Chicago Board of Trade* v. *United States,* 246 U. S. 231; *United States* v. *U. S. Steel Corporation,* 251 U. S. 417; *United States* v. *Knight Co.,* 156 U. S. 1; *Anderson* v. *United States,* 171 U. S. 604; *Swift & Co.* v. *United States,* 196 U. S. 375; *United Mine Workers* v. *Coronado Co.,* 259 U. S. 344; *National Fireproofing Co.* v. *Mason Builders' Assn.,* 169 Fed. 259.

III. The wage scale does not bind a factory to operate during only one period, but in effect fixes the period of time during which the workers in the industry will work for one group of factories and the period of time during

which the workers will work for the second group. To prevent the workers from so rationing their labor denies them a right to freedom of contract in respect to their services guaranteed to them by the Fifth Amendment. *Arthur* v. *Oakes,* 63 Fed. 310; *National Fireproofing Co.* v. *Mason Builders' Assn.,* 169 Fed. 259; *National Protective Assn.* v. *Cumming,* 170 N. Y. 315; *Grassi Co.* v. *Bennett,* 160 N. Y. S. 279; *Wunch* v. *Shankland,* 69 N. Y. S. 349; s. c. 170 N. Y. 573; *Pickett* v. *Walsh,* 192 Mass. 572; *Clemitt* v. *Watson,* 14 Ind. App. 38; *Jetton-Dekle Co.* v. *Mathew,* 53 Fla. 969; *Longshore Co.* v. *Howell,* 26 Ore. 527; *Bowen* v. *Matheson,* 14 Allen, 429; *Allgeyer* v. *Louisiana,* 165 U. S. 578; 2 Tiedeman, State and Federal Control of Persons and Property, p. 939; *In re Jacobs,* 98 N. Y. 106; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *State* v. *Kreutzberg,* 114 Wis. 530; *Erdman* v. *Mitchell,* 207 Pa. St. 79.

IV. The right to negotiate a wage scale is one of the rights guaranteed to a labor union by § 6 of the Clayton Act. The chief function of a labor union is the fixing of a wage scale covering periods of labor and wages. If the fixing of this scale is deemed a restraint of commerce, the right of labor to form and operate the labor union becomes an empty right, and § 6 of the Clayton Act is in effect vitiated and the benefits conferred by the act taken away. *Carew* v. *Rutherford,* 106 Mass. 1; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505; Martin, Modern Law of Labor Unions, p. 13; *Powers* v. *Journeymen Bricklayers' Union,* 130 Tenn. 643.

V. The wage agreement in question involves manufacture only and not interstate commerce and is, therefore, beyond the regulatory power of Congress. *United States* v. *Knight Co.,* 156 U. S. 1; *Cornell* v. *Coyne,* 192 U. S. 418; *United Mine Workers* v. *Coronado Co.,* 259 U. S. 344; *Gable* v. *Vonnegut Co.,* 274 Fed. 66; *Federal Trade Comm.* v. *Claire Furnace Co.,* 285 Fed. 936; *In re Green,* 52 Fed.

104; *Oliver Co.* v. *Lord,* 262 U. S. 172; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245; *Kidd* v. *Pearson,* 128 U. S. 120; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Delaware, etc. R. R. Co.* v. *Yurkonis,* 238 U. S. 439; *Crescent Co.* v. *Mississippi,* 257 U. S. 129.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a proceeding brought by the United States under the Act of July 2, 1890, c. 647, § 4; 26 Stat. 209, to prevent an alleged violation of § 1, which forbids combinations in restraint of trade among the States. The defendants are all the manufacturers of handblown window glass, with certain of their officers, and the National Window Glass Workers, a voluntary association, its officers and members, embracing all the labor to be had for this work in the United States. The defendants established a wage scale to be in effect from September 25, 1922, to January 27, 1923, and from January 29, 1923, to June 11, 1923; and the feature that is the object of the present attack is that this scale would be issued to one set of factories for the first period and to another for the second, but that no factory could get it for both, and without it they could not get labor and therefore must stop work. After a hearing a final decree was entered enjoining the defendants from carrying out the above or any similar agreements so far as they might limit and prescribe the time during which the defendant manufacturers should operate their factories for handblown window glass. 287 Fed. 228.

This agreement does not concern sales or distribution, it is directed only to the way in which union labor, the only labor obtainable it is true, shall be employed in production. If such an agreement can be within the Sherman Act at least it is not necessarily so. *United Mine Workers of America* v. *Coronado Coal Co.,* 259 U. S. 344, 408. To determine its legality requires a consideration

of the particular facts. *Board of Trade of Chicago* v. *United States,* 246 U. S. 231, 238.

The dominant fact in this case is that in the last quarter of a century machines have been brought into use that dispense with the employment of the highly trained blowers and the trained gatherers needed for the handmade glass and in that and other ways have enabled the factories using machines to produce window glass at half the cost of the handmade. The price for the two kinds is the same. It has followed of course that the companies using machines fix the price, that they make much the greater part of the glass in the market, and probably, as was testified for the defendants, that the handmakers are able to keep on only by the sufferance of the others and by working longer hours. The defendants say, and it is altogether likely, that the conditions thus brought about and the nature of the work have driven many laborers away and made it impossible to get new ones. For the work is very trying, requires considerable training, and is always liable to a reduction of wages if the machine industry lowers the price. The only chance for the handworkers has been when and where they could get cheap fuel and therefore their tendency has been to follow the discoveries of natural gas. The defendants contend with a good deal of force that it is absurd to speak of their arrangements as possibly having any effect upon commerce among the States, when manufacturers of this kind obviously are not able to do more than struggle to survive a little longer before they disappear, as human effort always disappears when it is not needed to direct the force that can be got more cheaply from water or coal.

But that is not all of the defendants' case. There are not twenty-five hundred men at present in the industry. The Government says that this is the fault of the union; the defendants with much greater probability that it is the inevitable coming to pass. But wherever the fault, if

there is any, that is the fact with which the defendants had to deal.  There were not men enough to enable the factories to run continuously during the working season, leaving out the two or three summer months in which the heat makes it impossible to go on.  To work under-manned costs the same in fuel and overhead expenses as to work fully manned, and therefore means a serious loss. On the other hand the men are less well off with the un-certainties that such a situation brings.  The purpose of the arrangement is to secure employment for all the men during the whole of the two seasons, thus to give all the labor available to the factories, and to divide it equally among them.  From the view that we take we think it unnecessary to explain how the present system sprang from experience during the war when the Government restricted production to one-half of what it had been and an accident was found to work well, or to do more than advert to the defendants' contention that with the means available the production is increased.  It is enough that we see no combination in unreasonable restraint of trade in the arrangements made to meet the short supply of men.

*Decree reversed.*
*Petition dismissed.*