### VITAGRAPH, Inc., et al. v. PERELMAN et al.
### No. 5841.

Circuit Court of Appeals, Third Circuit.
Jan. 16, 1936.

On Rehearing March 9, 1938.

Morris Wolf, of Philadelphia, Pa., and Edwin L. Weisl, of New York City, for appellants.

Benjamin M. Golder and Otto Kraus, Jr., both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

This is an appeal from a decree of the District Court in a suit in equity under sections 12 and 16 of the Clayton Act (15 U.S.C.A. §§ 22, 26) for an injunction to restrain violations of sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1, 2) and section 3 of the Clayton Act (15 U.S. C.A. § 14). The District Court held that the appellants, hereinafter called defendants, as they were below, had violated certain provisions of those acts and entered a decree restraining them from further violations.

The appellees, Harry Perelman and Louis Perelman, hereinafter called plaintiffs, are the owners and operators of two motion picture theaters in Philadelphia.

The defendants, Vitagraph, Inc., RKO Distributing Corporation, Paramount Pictures Distributing Corporation, Metro-Goldwyn-Mayer Distributing Corporation, United Artists Corporation, and Fox Films Corporation, are distributors of motion pictures in interstate commerce. The Fox

Films Corporation is the only one of the defendants who also produces motion pictures.

Motion pictures are exhibited either in theaters which are controlled in some fashion by producing companies or their subsidiaries or in theaters operated by persons who are not connected with producers or their subsidiaries, such as the two theaters owned and operated by the plaintiffs. The first group of exhibitors is called "affiliated theaters" and the second "independent theaters."

There are a number of affiliated theaters in Philadelphia. With their connections, they are able to display the earliest exhibitions of motion pictures released by the largest producers through their distributors. Naturally, this gives to them a considerable advantage.

Theaters which are operated by persons who lack the connections or resources to display "first run" motion pictures are able to exist only by offering the public something other than novelty. A common means of attracting audiences has been to offer an exhibition of two full-length motion pictures at one performance and for one admission.

The group of producers which the defendants represent furnish considerably more than half of all the motion pictures exhibited in the United States. The remainder of the pictures are produced by a few other large producers, not defendants here, and a group of small companies, sometimes called "independent" or "minor" producers.

The independent theaters are required by necessity to purchase motion pictures from the defendants. They would be unable to remain in business without offering such exhibitions, and the defendants and their connections derive a large share of their income from these theaters.

The independent theaters, including the plaintiffs, purchase motion pictures for the purpose of exhibition from the major producers or their distributors by contract for a period of time in anticipation of their needs. The method used is known to the industry as "block booking." At the time the contracts are made, the motion pictures are not identified, the contracts simply call for a supply of films to fill the number of exhibitions anticipated.

In the case of the plaintiffs, the contracts with the defendants contain a clause in which the plaintiffs agree not to display another full length motion picture or feature with the one supplied by the contract. The causes prohibiting double featuring are worded differently, but are contained in one form or another in the plaintiffs' contracts with all of the defendants. The following clauses appear to be typical of those used:

"Exhibitor agrees not to exhibit any other pictures of feature length."

"The exhibitor agrees not to exhibit any of the feature photoplays licensed for exhibition hereunder at the same performance with any other photoplay of feature length, that is, as part of a double feature program; that upon violation hereof Distributor shall have the right to terminate this agreement and recover from the exhibitor as damages for such violation the license fee payable in respect of all photoplays not theretofore exhibited hereunder."

"Exhibitor agrees not to exhibit any of the photoplays licensed for exhibition hereunder at the same performance with any other photoplay of feature length. That is as part of a double feature program and that upon violation hereof distributor shall have the right to change or modify the run, availability and or protection herein provided for."

The plaintiffs base their suit on the clauses in their contracts prohibiting double featuring.

The District Court found as facts that in order to obtain feature motion pictures which are necessary to the continued existence of the plaintiffs and other independent theaters they must sign the contracts in the form offered by the defendants, that they cannot survive by exhibiting features produced solely by minor producers; that the double feature clauses cause such independent theaters to purchase fewer feature films and lessens the production of such films by minor or independent producers; that double featuring increases the production of full length films.

The court further found as facts that the prohibiting of double featuring tends to create a monopoly in the production and distribution of pictures in the defendants and their affiliates and connections in the motion picture industry; that it tends to lessen competition by restricting such independent theaters from purchasing from the defendants' competitors; that the restrictive clauses are the result of an agreement among the defendants and the other major

interests in the industry; and that the insertion of the restrictive clauses in the contracts is the result of a combination and conspiracy among the defendants and other major companies in the industry.

The court concluded as a matter of law that the restrictive double feature clauses were inserted in their contracts with the plaintiffs as the result of a combination and conspiracy in restraint of trade and commerce among the several states, and that the combination or conspiracy lessens competition and tends to create a monopoly of interstate commerce and trade, and that by placing such clauses in the contracts, the defendants have violated section 1 of the Sherman Act (15 U.S.C.A. § 1) and section 3 of the Clayton Act (15 U.S.C.A. § 14) and that the plaintiffs are entitled to an injunction. These sections provide as follows:

Section 1 of the Sherman Act: "Section 1. Trusts, etc., in restraint of trade illegal; penalty. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. (July 2, 1890, c. 647, § 1, 26 Stat. 209.)" 15 U.S.C.A. § 1.

Section 3 of the Clayton Act: "§ 14. Sale, etc., on agreement not to use goods of competitor. It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. (Oct. 15, 1914, c. 323, § 3, 38 Stat. 731.)" 15 U.S.C.A. § 14.

The defendants contend that there is no evidence of a combination or conspiracy among the defendants concerning the double feature clauses contained in the plaintiffs' contracts and that if the evidence supported such a finding, the restrictive clauses constitute neither a violation of the Sherman Act nor of the Clayton Act.

The first question is whether or not the defendants have as a fact combined and conspired to prohibit the exhibition of double features. We have no power to disturb the finding of the District Court if there is any substantial evidence to support it.

It is admitted that double featuring has been a serious problem in the industry. In some sections of the country it is a common practice in motion picture theaters. In certain urban districts, small theaters generally independently owned have resorted to the practice to enable them to compete with the larger, more luxurious theaters which enjoy the privileges of exhibiting first run motion pictures and other attractions. Without enlarging on that condition in the industry, a great many implications immediately arise.

The testimony bears them out despite the insistence of the defendants by a greater number of witnesses that they have neither combined, nor conspired, nor agreed to destroy the practice of exhibiting double features.

There is testimony to the following effect:

The defendants are connected with the strongest interests of the industry. They distribute more than half of the annual production in which the artists who command the largest audiences are displayed. Their productions are the most comprehensive and pleasing. While they compete among themselves, they have a common interest in confronting the minor or independent producers who lack the resources to manufacture exhibitions on their scale. The independent theaters require their productions in order to continue in business. But to improve their business and to permit them in some fashion, other than by offering lower prices of admission, to carry on in the face of the de luxe theaters, they must exhibit double features. The independent theaters generally purchase the second full-length film from the independent producer, but they are prohibited from exhibiting double features, as in the case of the plaintiffs, by their contracts with the

major producers. Thus, they purchase less films from the independent producers.

With such a situation admittedly existing in the industry, one might logically be struck with the idea that it is more than mere coincidence that the defendants who represent a large majority of the major producers are in unanimity in prohibiting double features in their contracts. The fact that this unanimity of purpose is not carried out formally in the same language does not destroy the inference. Coincidence in form as well as purpose might have been fatal; while here the plaintiffs are required to bring forward other evidence to establish their case.

■ The finding of the District Court that a combination and conspiracy existed among the defendants is binding upon us in view of the testimony of the plaintiffs' witness, Chadwick, an independent producer, and Kuykendahl, the president of the largest organization of independent theaters.

Chadwick testified as to the development and growth of the double featuring which led to the prohibition of the practice by the defendants in their California contracts in 1930. That resulted in a consent decree to the effect that the defendants had entered into a conspiracy violating the Sherman Act. Dissatisfaction with the injunction caused the industry in 1932 to agree voluntarily to discontinue double featuring. On May 1, 1934, at a meeting of exhibitors, producers, and distributors in Los Angeles at which the defendants were represented, an executive of one of the defendants purported to speak on behalf of the defendants and stated that a method had been devised to stop the exhibition of double features and that the distributors could take and had taken steps to remove the menace. He further stated to the meeting that the practice had been stopped in Chicago and if the theaters wanted features, they must use "our features and not use double features."

Kuykendahl, a witness for the defendants, testified how he and the association which he represented repeatedly urged the defendants to stop double featuring and that they agreed to co-operate with his association to that end.

The testimony as to the consent decree was not admitted as, or intended to be, prima facie evidence against the defendants in this case, but was simply admitted as a fact in showing the activity of the defendants to prevent double featuring, and as such the testimony was admissible.

■ The defendants argue that Chadwick's testimony concerning the statements made at the meeting in May, 1934, by the executive who purported to represent the defendants there present was inadmissible. Their contention is based on the rule that agency cannot be proved by the declarations of an agent. That is so, but the speaker was the president of the distributor's organization and he was introduced in the presence of the defendants to speak and did speak on their behalf. Furthermore this is not a question of agency, but was simply a statement by one of the conspirators in the presence of the other conspirators of what they had done and intended to do to stop double featuring.

The defendants point to the fact that a number of their witnesses who were either officers or managing agents in the Philadelphia district of one or another of the defendants, testified to the effect that there was no conspiracy or concerted action between the defendants in reference to the double feature provisions of the contract. They further testified that in every case such provisions were the result of independent judgment.

As we have stated heretofore, we cannot retry this case for the defendants. The authorities which they cite are inapplicable here. Ariasi v. Orient Insurance Company, 50 F.(2d) 548 (C.C.A.9); Arnall Mills v. Smallwood, 68 F.(2d) 57 (C. C.A.5); Pennsylvania Railroad Company v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819. The District Court did not arbitrarily reject the defendant's testimony. It chose rather to accept as probable the plaintiffs' case which was built on a background of direct and circumstantial evidence. That is the right of the trial court.

The defendants pointed out that the plaintiffs argued that the testimony of the executives and the managers was inherently improbable because they testified that the defendants had not discussed the matter of double featuring with one another. The defendants go on to say: "Everybody in the motion picture industry knew the rule laid down by the Supreme Court in the Paramount Case, (Paramount Famous Lasky Corporation v. United States, 282 U. S. 30, 51 S.Ct. 42, 75 L.Ed. 145), and every one of these large organizations understood that it must act in the formation

of its policies according to its independent judgment and without conference or agreement with its competitors. This is the perfectly obvious reason why the men in the various defendant companies did not discuss this question of policy with each other, but acted on their own judgment."

That argument in itself has been seized upon, with some justification, by the plaintiffs to bring the defendants within the rule that a conspiracy may be made out without express words or writings, but simply by working toward a common purpose through a tacit understanding or agreement. Thornton, On Combinations in Restraint of Trade, page 492 and the cases cited therein. The defendants might have refrained from discussing openly in conference the question of double featuring for the obvious reason of avoiding violations of the principles laid down in the Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 45, 75 L. Ed. 145.

In that case, the Supreme Court held that an agreement of the ten competitors controlling 60 per cent. of the motion picture industry to refuse to contract with exhibitors except on a standard form which provides for compulsory joint arbitration violated section 1 of the Sherman Act. The court said therein: "It may be that arbitration is well adapted to the needs of the motion picture industry; but, when under the guise of arbitration parties enter into unusual arrangements which unreasonably suppress normal competition, their action becomes illegal."

■ The second question is whether or not the restrictive double feature clauses in the defendants' contracts with the plaintiffs resulting from a combination or conspiracy between the defendants violate section 1 of the Sherman Act (15 U.S.C.A. § 1) and section 3 of the Clayton Act (15 U.S.C.A. § 14).

Section 1 of the Sherman Act makes contracts, combinations, and conspiracies in restraint of interstate trade or commerce illegal. Section 3 of the Clayton Act outlaws contracts in which a party agrees not to use the goods of a competitor.

In Appalachian Coals, Inc. v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 474, 77 L.Ed. 825, the court said: "The purpose of the Sherman Anti-Trust Act is to prevent undue·restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape. The restrictions the act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness. They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that commerce or the adoption of reasonable measures to protect it from injurious and destructive· practices and to promote competition upon a sound basis. The decisions establish, said this Court in Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232, 'that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.'"

The double feature clauses undoubtedly reduce the production of full-length motion pictures. So great is the public demand for the defendants' films that independent theaters must exhibit them in order to stay in business. If they do exhibit features of one of the defendants they must agree not to display at the same time a feature of another producer. This naturally prevents exhibitors from purchasing films from producers who are in competition with the defendants and destroys the opportunity of those independent producers to produce and sell more films. The necessary and inevitable tendency of the conspiracy or combination is to produce a material and unreasonable restraint on interstate commerce. Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145.

Business necessity forces the exhibitors to buy from the defendants. It is true that they need not deal with the defendants if they do not wish to do so, but if they do not do so, they would be driven out of

business. The effects of the double feature clauses naturally result in strengthening the position of the defendants and weakening that of the independent competitor.

The defendants contend that the double feature provisions were adopted for the best interests of the industry, their customers and the public, and that the effects and motives of the defendants are important in determining whether or not there is an undue restraint of trade. For this, they rely upon the case of Appalachian Coals, Inc., supra.

In that case, the Supreme Court carefully considered evidence relating to the economic conditions existing in the bituminous coal industry to determine whether or not an agreement among coal producers to eliminate competitive and destructive practices was illegal. The court concluded that under the facts of that case, there was no undue restraint of competition and commerce and no violation of the Sherman Act. The court said that "the question under the act is not simply whether the parties have restrained competition between themselves but as to the nature and effect of that restraint."

But the court was emphatic in stating that good motives or intentions or benefits to the industry must give way to the law, and if there is an undue restraint of commerce and impairment of fair competitive opportunities, the statute must be applied.

The court did not intend that the Appalachian Coals Case should change its interpretation of the anti-trust laws. The test laid down in Nash v. United States, 229 .U.S. 373, 376, 33 S.Ct. 780, 57 L.Ed. 1232 (quoted in the Appalachian Case) has been restated, approved, and applied time and again. Maple Flooring Association v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; National Ass'n of Window Glass Mfrs. v. U. S., 263 U.S. 403, 44 S.Ct. 148, 68 L.Ed. 358; Paramount Famous Lasky Corporation v. United States, 282 U. S. 30, 51 S.Ct. 42, 75 L.Ed. 145.

In this case the District Court found that the defendants had combined or conspired to outlaw the exhibition of full-length motion pictures. The evidence of the conditions in the industry leads to the conclusion that the inclusion of those provisions in the contracts between the defendants and independent exhibitors seriously affects the exhibitors and the smaller business. The effects of the double feature clauses naturally result in strengthening the position of the defendants and weakening that of the independent competitor.

producer. This tends to reduce production and stifle competition. Whether or not the defendants intended to suppress competition, we do not need to know; the fact is that their contracts operated to that effect.

It may also be said for the same reasons that in practical effect, the restrictive clauses relating to the exhibition of double features result in contracts not to use the goods of competitors, and that such clauses both substantially lessen competition from independent exhibitors and producers and tend to create a monopoly in the defendants or their connected interests. United Shoe Machinery Company v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708.

The plaintiffs brought suit under sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1, 2) and section 3 of the Clayton Act (15 U.S.C.A. § 14), but the District Court found that the defendants had violated only section 1 of the Sherman Act and section 3 of the Clayton Act. The proofs unquestionably show that the defendants violated section 1 of the Sherman Act, which entitles plaintiffs to injunctive relief under section 16 of the Clayton Act (15 U.S.C.A. § 26). It becomes unnecessary to determine whether or not the defendants also violated section 2 of the Sherman Act. It may be that section 3 of the Clayton Act was also violated, but as there is some question as to the sufficiency of the pleadings to support such a finding, we do not determine that question here.

Warner Brothers Pictures, Inc., First National Pictures, Inc., and Paramount Publix Corporation were declared as parties in the bill of complaint in this case. They are producers outside of the jurisdiction of the trial court and were not served. While their names appeared in the caption on appeal, they were in fact not proper parties, and, consequently, have been omitted from it.

The decree of the District Court is affirmed.

On Petition for Rehearing.

PER CURIAM.

After reargument and full consideration had, we adhere to the original opinion filed.

Accordingly, the decree of the court below is affirmed.