*741 My Brother White,
joined by The Chief Justice and Mr. Justice Brennan,
while not agreeing with my Brother Douglas, would reverse the Court of Appeals. He also, however, refuses to give full effect to the congressional intent that judges should not, under cover of the Sherman Act umbrella, substitute their economic and social policies for free collective bargaining. My Brother White recognizes that the issue of the hours of sale of meat concerns a mandatory subject of bargaining based on the trial court’s findings that it directly affected the hours of work of the butchers in the self-service markets, and therefore, since there was a finding that the Union was not abetting an- independent employer conspiracy, he joins in reversing the Court of Appeals. In doing so, however, he apparently draws lines among mandatory subjects of bargaining, presumably based on a judicial determination of their importance to the worker, and states that not all agreements resulting from Collective bargaining based on mandatory subjects of bargaining are immune from the antitrust laws, even absent evidence of union abetment of an independent conspiracy of employers. Following this reasoning, my Brother White indicates that he would sustain a judgment here, even absent evidence of union abetment of an independent conspiracy of employers, if the trial court had found “that self-service markets could actually operate without butchers, at least for a few hours after 6 p. m., that no encroachment on butchers’ work would result and that the workload of butchers during normal working hours would not be substantially increased . . . .” Ante, at 692. Such a view seems to me to be unsupportable. It represents a narrow, confining view of what labor unions have a legitimate interest in preserving and thus bargaining about. Even if the self-service markets could operate after 6 p. m., without their butchers and without increasing the work of their butchers *742 at other times, the result of such operation can reasonably be expected to be either that the small, independent service markets would have to remain open in order to compete, thus requiring their union butchers to work at night, or that the small, independent service markets would not be able to operate at night and thus would be put at a competitive disadvantage.[26] Since it is clear that the large, automated self-service markets employ fewer butchers per volume of sales than service markets do, the Union certainly has a legitimate interest in keeping service markets competitive so as to preserve jobs. Job security of this kind has been recognized to be a legitimate subject of union interest. See Telegraphers v. Chicago & N. W. R. Co., 362 U. S. 330; Teamsters Union v. Oliver, 358 U. S. 283, 362 U. S. 6O5; United States v. Hod Carriers, 313 U. S. 539, affirming United States v. Carrozzo, 37 F. Supp. 191 (D. C. N. D. Ill.); United States v. American Federation of Musicians, 318 U. S. 741, affirming 47 F. Supp. 304 (D. C. N. D. Ill.) ; Window Glass Mfrs. v. United States, 263 U. S. 403; cf. Teamsters Union v. Hanke, 339 U. S. 470, 475 (opinion of Mr. Justice Frankfurter); see also California Sportswear & Dress Assn., Inc., 54 F. T. C. 835. As I have previously stated: “To believe that labor union interests may not properly extend beyond mere direct job and wage competition is to ignore not only economic and social realities so obvious as not to need mention, but also the graphic lessons of American labor union history.” Los Angeles Meat & Provision Drivers Union v. United States, 371 U. S. 94, 103, 104 (concurring opinion). The direct interest of the union in not working undesirable hours by curtailing all business at those hours is, of course, a far cry from the indirect “interest” in Allen *743 Bradley in fixing prices and allocating markets solely to increase the profits of favored employers.
Indeed, if the Union in Jewel Tea were attempting to aid the small service butcher shops and thus save total employment against automation, perhaps at a necessarily reduced wage scale, the case would present the exact opposite union philosophy from that of the Mine Workers in Pennington. Putting the opinion of the Court in Pennington together with the opinions of my Brothers Douglas and White in Jewel Tea, it would seem that unions are damned if their collective bargaining philosophy involves acceptance of automation (Pennington) and are equally damned if their collective bargaining philosophy involves resistance to automation (Jewel Tea). Again, the wisdom of a union adopting either philosophy is not for judicial determination. This Court recently stated that “we emphatically refuse to go back to the time when courts used the Due Process Clause ‘to strike down state laws, regulatóry of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.’ ” Ferguson v. Skrupa, 372 U. S. 726, 731-732. I likewise see no reason why this Court should go back to the time when judges determined “according to their own economic and social views whether the damage inflicted on an employer in an industrial struggle was damnum absque injuria, because an incident of trade competition, or a legal injury, because in their opinion, economically and socially objectionable.” Duplex Co. v. Deering, supra, at 486 (dissenting opinion of Mr. Justice Brandeis).
VI.
Moreover, while these cases involve suits against unions, we should not overlook the fact that if unions are held liable under the antitrust laws for collective bargaining activities concerning mandatory subjects, then *744 the employer parties to this mandatory collective bargaining would also be subject to antitrust penalties, criminal and civil. It would seem the height of unfairness so to penalize employers for the discharge of their statutory duty to bargain on wages, hours, and other terms and conditions of employment, which duty, this Court has held, requires the employer to enter into a signed contract with the union embodying the collective bargaining terms agreed upon. See H. J. Heins Co. v. Labor Board, 311 U. S. 514. The unfairness to employers of this situation is aptly illustrated by the record facts of Pennington. From 1930 until the formation of the Bituminous Coal Operators’ Association and the negotiation of a uniform wage agreement between the Association and the union in 1950, bargaining in the coal industry was highlighted by bitter and protracted negotiations. Costly strikes were a recurring phenomenon and government seizure of the mines was characteristic of most of the period. Unfair labor practice charges were often exchanged and lawsuits resulting from bargaining differences were on court dockets continuously. In 1934, 400,000 miners struck for one week. In 1939, a five-week strike ended only after presidential intervention. In 1941, the union struck southern mines after those operators withdrew from negotiations in which the union was seeking to eliminate a regional wage differential. . Shortly thereafter the union struck the so-called “captive” mines (mines which produce coal to be used in the processing of other products, mainly steel). One hundred thousand other miners struck in sympathy with the captive mine employees. During negotiations in 1943, there were a number of strikes over a six-month period and the Government twice seized the struck mines. Similarly in 1945 a number of strikes following a breakdown in negotiations resulted in government seizure of 235 mines. When the Government seized the mines once again in 1946 because *745 of a breakdown in negotiations over a welfare fund, a settlement was reached only through the active intervention of the Secretary of the Interior, who himself negotiated the beginning of the program of welfare fund benefits.
It was the opinion of many employers and neutral observers of the scene that these chaotic collective bargaining conditions were a result, at least in part, of the disorganized bargaining on the employer side. With each new effort at negotiations the operators had attempted to form a committee with various subcommittees to receive and present bargaining proposals. There was, however, no permanent organization to unify the operators’ bargaining position and thereby to attempt to maintain peaceful and stable labor relations. The amorphous and ad hoc nature of the employers’ bargaining organization was felt to have subjected the operators to whipsawing by the union and thus impaired serious, good faith and business-like bargaining. It was to try to correct this situation that the Association was formed. The Association is open to any coal operator who wishes to participate in the negotiations through it. Since this change in 1950, collective bargaining has been, to a marked degree, stabilized in the industry. There have been no governmental seizures or nation-wide strikes. Collective bar-. gaining problems have not ended as a matter of course in Labor Board or court proceedings, or in governmental seizure or other intervention. While the negotiations have not always been easy and many difficult issues have arisen, the procedure for solving them has gone from the earlier jungle-type economic warfare to the reasoned and rational process of the conference table. I cannot believe that Congress, which has manifested a clear general purpose of promoting labor peace and stability, and, in particular, has a long history of attention to collective bar *746 gaining in coal,[27] one of our basic industries, intended that these employer efforts to perfect a solid front in bargaining with the miners union should have the effect of subjecting the employers, as well as the union, to the penalties of the antitrust laws. To apply the antitrust laws at this late date to such activities would endanger the stability which now characterizes collective bargaining in the coal industry and other basic industries with similar collective bargaining histories. It is in recognition of this fact that Congress has on a number of occasions refused to enact legislation that would curtail industry-wide bargaining[28] or would make the antitrust laws generally applicable to collective bargaining activity.[29]
VII.
My view that Congress intended that collective bargaining activity on mandatory subjects of bargaining under the Labor Act not be subject to the antitrust laws does not mean that I believe that Congress intended that activity involving all nonmandatory subjects of bargaining be similarly exempt. The direct and overriding interest of unions in such subjects as wages, hours, and other working conditions, which Congress has recognized in making them subjects of mandatory bargaining, is clearly *747 lacking where the subject of the agreement is price-fixing and market allocation. Moreover, such activities are at the core of the type of anticompetitive commercial restraint at which the antitrust laws are directed.
Nor does my view mean that where a union operates as a businessman, exercising a proprietary or ownership function, it is beyond the reach of the antitrust laws merely because it is a union. On the contrary, the labor exemption is inapplicable where the union acts not as a union but as an entrepreneur. See, e. g., Streiffer v. Seafarers Sea Chest Corp., 162 F. Supp. 602 (D. C. E. D. La.); United States v. Seafarers Sea Chest Corp., 1956 CCH Trade Cases ¶ 68,298 (D. C. E. D. N. Y.). Therefore, if a union is found by sufficient evidence and under proper instructions to have participated as a proprietor in actions violative of the antitrust laws, it is no more shielded from antitrust sanctions than any other business participant.
In Pennington, there were allegations that a part of the conspiracy of the large coal operators consisted of collusive bidding on the TVA spot market of West Kentucky Coal Company, Nashville Coal Company, and two other coal operators, for which the Union allegedly shared responsibility. It was asserted that the effect of this alleged collusive bidding was to drive down the prices on the spot market and thereby injure the small coal operators. Although the Court of Appeals apparently accepted this position, it did not deal directly with the question of whether the evidence was sufficient to show the Union’s participation in the alleged scheme. Rather, the Court of Appeals relied upon the fact that the Union was a major stockholder in West Kentucky and had substantial interests in Nashville. It examined the origin and growth of the union interest in these two companies and concluded: “It was not unreasonable for the jury to conclude from these facts that it was the purpose of the UMW to have a very material voice, if not the domi *748 nant one, in determining the policies and operations of these two major coal companies, which, as is hereinafter pointed out are charged with playing an important role in the alleged conspiracy.” 325 F. 2d 804, 814. This, it appears, is as near as the Court of Appeals came to passing upon the sufficiency of the evidence connecting the Union with the alleged collusive spot market bidding and in effect is a holding that the ownership of a controlling or substantial interest in a company which violates the antitrust laws subjects the owner of that interest to personal antitrust liability. In my view, this is clearly not the law. The ownership of a controlling or substantial interest in a company which conspires with others in violation of the antitrust laws does not in itself impose antitrust liability on the owner. Hartford-Empire Co. v. United States, 323 U. S. 386, 403; Buckeye Powder Co. v. E. I. du Pont de Nemours P. Co., 223 F. 881, 885-886 (C. A. 3d Cir.), aff’d on other grounds, 248 U. S. 55; Union Pacific Coal Co. v. United States, 173 F. 737 (C. A. 8th Cir.). Rather the owner must be shown to have participated knowingly and actively in the alleged illegal activity. See United States v. Wise, 370 U. S. 405, 416. Cf. Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 299-305; United Mine Workers v. Coronado Co., 259 U. S. 344, 393-396.
Moreover, the trial court erred in its instruction to the jury on this issue. It correctly instructed the jury that union ownership of a coal company did not violate the law. However, it erroneously refused to instruct the jury that the Union’s financial stake in the two coal companies did not of itself show participation in an illegal conspiracy, if there was one, and that the Union must have been shown to have participated through being party to an overall plan which included the spot-market bidding or through its participation in the particular practices complained *749 of. Thus it is clear that the judgment against the Union cannot stand on the basis of this part of the case.
Finally, my conclusion that unions and employers are exempt from the operations of the antitrust laws for activities involving subjects of mandatory bargaining is based solely on congressional statutes which I believe clearly grant such an exemption and not on any views past or present as to the economic desirability of such an exemption. Whether it is wise or sound public policy for this exemption to continue to exist in its present form, or at all, or whether the exemption gives too much power to labor organizations, is solely for Congress to determine. The problem of the application of the antitrust laws to collective bargaining is but another aspect of the question of whether it is sound public policy to recognize or to limit the “right of industrial combatants to push their struggle to the limits of the justification of self-interest.” Duplex Co. v. Deering, supra, at 488 (dissenting opinion of Mr. Justice Brandéis).
On this issue I am in agreement with the Court in Hunt v. Crumboch, supra, at 825, n. 1: “That which Congress has recognized as lawful, this Court has no constitutional power to declare unlawful, by arguing that Congress has accorded too much power to labor organizations.”
For the reasons expressed above, I dissent from the opinion of the Court but concur in the reversal of the Court of Appeals in Pennington, and concur in the judgment of the Court in Jewel Tea.

 It is clear that the small service butcher shops cannot operate at night without butchers on duty. There is no doubt that the Union could bargain with them as to the hours its members worked.

 See, e. g., Hearings before a Subcommittee of the Senate Committee on Interstate Commerce on S. 1417, 74th Cong., 1st Sess.; Hearings before the Senate Committee on Interstate Commerce on S. 4668, 74th Cong., 2d Sess.; Hearings before a Subcommittee of the Senate Committee on Interstate Commerce on S. 1, 75th Cong., 1st Sess.; Hearings before a Subcommittee of the House Committee on Education and Labor, Welfare of Miners, 80th Cong., 1st Sess.; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare on S. Res. 274, 81st Cong., 2d Sess.; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare, Causes of Unemployment in the Coal and Other Domestic Industries, 84th Cong., 1st Sess.

 See pp. 712-713, supra.

 See notes 8, 9, supra, and accompanying text.