Gladys **ARENSON** et al., Plaintiffs,

v.

The **CHICAGO MERCANTILE EX-
CHANGE** et al., Defendants.

No. 71 C 854.

United States District Court,
N. D. Illinois, E. D.

April 26, 1974.

Aram A. Hartunian, Pressman & Hartunian, Chicago, Ill., for plaintiffs.

William R. Jentes, Kirkland & Ellis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the motion, submitted to this Court on April 19, 1974, by counsel for certain plaintiffs in the

instant consolidated cases, requesting an order that the Chicago Board of Trade of the City of Chicago ("Board of Trade") and other defendants show cause why they should not be held in contempt of this Court's Order Approving Settlement and Final Judgment, dated June 8, 1973 (hereinafter referred to as "June 8, 1973 Order").

This Court's June 8, 1973 Order provides in relevant part:

"C. Each participating exchange, within sixty days after this order becomes final, is ordered to amend its rules or by-laws to provide that not later than the dates listed in the following schedule, nonmember rates of commission shall be subject to free and open competition on that portion of each commodity transaction . . . exceeding the number of contracts[1] specified opposite such dates:

| Schedule of Dates | That Portion of Each Transaction Exceeding: |
|---|---|
| 60 days after this order approving the settlement becomes final | 24 contracts |
| 1 year thereafter | 19 contracts |
| 2 years thereafter | 14 contracts |
| 3 years thereafter | 9 contracts |
| 4 years thereafter | 4 contracts |

Not later than four and one-half years after this order becomes final, all nonmember rates of commission on commodity transactions on such participating exchanges shall be subject to full and open competition.

D. Except as ordered and directed in Paragraph C hereof, each participating exchange is hereby authorized to continue to prescribe and enforce its minimum rates of commission during the above transitional period and each member of such exchange is hereby authorized to continue to charge such prescribed minimum rates of commission, provided that no exchange, without court approval, will

increase any minimum rates of commission in effect as of November 1, 1972." [2]

On or about February 27, 1974 the defendant Board of Trade published and delivered to its members notice of a ballot vote to be taken on March 14, 1974 on the adoption of proposed Rule 136. On March 14, 1974 the defendants did meet and through its members voted passage of Rule 136 and it was thereupon adopted as one of the rules of defendant Board of Trade. The Board of Trade submitted Rule 136 to the Commodity Exchange Authority ("CEA") on March 15, 1974 for its review in accordance with Section 5a(1) of the Commodity Exchange Act. The relevant 21 day period for comment by the CEA has passed. The Board of Trade has received no objection to the Rule from the CEA under Section 8a(7) of the Act.

Rule 136 provides for an exchange service fee on contracts traded for the accounts of members at the rate of $100 per calendar quarter for each membership owned. The rate on trades for the accounts of nonmembers is 25¢ per side on each contract traded. In each instance the fee is imposed on the owner of the account making the trade. In the case of nonmember customers, this means the member is obligated to charge his customer the exchange service fee in his statement.

Rule 136 provides in relevant part:

"(b) Non-member. Effective on the date set by regulation adopted by the Board, each member, registered partnership or registered corporation handling the funds of non-member customers shall include, in the statements to each customer, an Exchange Service Fee of 25 cents for each Board of Trade futures contract bought, sold or delivered for the account of the nonmember customer. All Exchange Service Fees collected from non-mem-

---

1. " 'Contract' means a contract made on an exchange for the purchase or sale of a unit of commodity for future delivery. For example, a corn contract on the Chicago Board of Trade equals 5,000 bushels, and a pork belly contract on the Chicago Mercantile Exchange equals 36,000 pounds."

2. See pages 11 and 12 of this Court's Order of June 8, 1973.

ber customers shall be remitted by the member, registered partnership or registered corporation to the Association at such times and in such manner as the Board may prescribe. The Exchange Service Fees remitted to the Association in respect to non-member transactions shall be expended only for purposes determined by the Board to be of substantial benefit to non-member customers. The total of funds committed to exchange operations which have resulted from the Exchange Service Fee on non-member transactions shall not exceed the funds committed which have resulted from assessments on memberships and Exchange Service Fees paid by members.

(c) Reports. Each member, registered partnership or registered corporation handling the funds of non-member customers shall submit to the Association such reports as the Board may deem necessary for the administration of this Rule.

(d) Enforcement. No member, registered partnership or registered corporation shall be obligated to the Association for the payment of Exchange Service Fees attributable to non-member transactions except to the extent that such fees are collected from non-member customers; provided, however, that each member, registered partnership and registered corporation responsible for the collection of Exchange Service Fees shall make a bona fide and diligent effort to collect such amounts and shall not have the right, without prior approval of the Association, to release or forgive any indebtedness of a non-member to the Association for Exchange Service Fees. In the event of delinquencies in the payment of Exchange Service Fees by a non-member, the Board in its discretion may order that further trading in the accounts of

such non-member shall be for liquidation only until the indebtedness is paid.

(e) Special Assessments. This rule shall not be construed to supersede Rule 108 in any way nor to abrogate the responsibility and right of the Board to levy such additional assessments, charges or fees upon the membership as may be necessary to meet the obligations of the Association."

The plaintiffs in support of their motion contend that Rule 136 is violative of this Court's Order of June 8, 1973 in the following ways:

1. As an increase over the nonmember rates in effect on November 1, 1972 the additional 25 cents per contract charge is contrary to paragraph D of the Order of June 8, 1973.

2. As a nonmember rate fixed and agreed to by combination of defendant's members, to be uniformly charged and collected by all members from all nonmembers, Rule 136 violates paragraph C of this Court's Order which compels that nonmember rates shall be subject to free and open competition on that portion of each commodity transaction exceeding 24 contracts during the one year period which commenced 60 days after the Order became final.[3]

The plaintiffs further contend that in the event of non-payment by a nonmember, Rule 136 provides for boycotting a customer and liquidation of the account in violation of the federal antitrust prohibitions.

After carefully considering the relevant order of this Court and pleadings, memoranda, affidavits and exhibits submitted by the parties in support of their respective positions, it is the opinion of this Court that the plaintiffs' motion is without merit.

3. The Order of June 8, 1973 became final on July 8, 1973; 60 days thereafter fell on September 6, 1973. Since the collection of the additional 25 cents under Rule 136 is sched-uled to commence on May 1, 1974, its implementation would occur within that first one year period.

■ In order to properly determine whether Rule 136 violates this Court's June 8, 1973 Order it is important to consider the following legal principle. It is well settled that the legality of an agreement or regulation cannot be determined by simply asking the question of whether it restrains competition. To bind, to restrain is the very essence of an agreement or regulation of trade. The proper test of legality is whether the restraint imposed is such as to merely regulate and perhaps thereby promote competition or whether it is such as may suppress or even destroy competition. In answering this question a court must consider the facts peculiar to the trade to which the restraint is applied; the condition of the trade before and after the putative restraint was imposed; the nature of the restraint and its effect, actual or probable. Further relevant facts are the history of the restraint, the putative evil believed to exist, the desired end sought to be attained. Consideration of this last factor is appropriate not because good intentions will save an otherwise objectionable regulation or the converse; but because knowledge of intent may help a court to interpret facts and to predict consequences.

■ Thus a rule or regulation of a trade is only prohibited by federal antitrust laws where, by reason of intent or inherent nature, it prejudices the public interests by unduly restricting competition or unduly obstructing the course of trade. Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). See also Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933);

National Association of Window Glass Manufacturers v. United States, 263 U. S. 403, 44 S.Ct. 148, 68 L.Ed. 358 (1923); Virginia Excelsior Mills v. Federal Trade Commission, 256 F.2d 538 (4th Cir. 1958).

■ The main thrust of this Court's Order Approving Settlement and Final Judgment dated June 8, 1973 was the prospective elimination of minimum nonmember rates of commission. Rule 136 from its very language appears to be an "exchange service fee" and not a specific addition to the nonmember rates of commission.

The basic purpose of Rule 136 is allegedly to provide for an "exchange service fee" to be imposed on both member and nonmember traders in order to help defray the operating expenses and capital needs of the Board of Trade. The nonmembers fee is imposed by the Board of Trade on the owner of the account making the trade, but, since the Board does not know the identity of nonmember account owners, Rule 136 provides that the members are to act as collection agents. This means the member is obligated to show the fee on the statement to his customer and to remit the fee to the Board of Trade when it is collected. Rule 136 provides that funds collected by the Board of Trade from nonmembers can be used only for those exchange purposes associated with fulfilling the Board's responsibility toward such nonmembers.[4] Thus the "exchange service fee" is not a "nonmember rate of commission" within the meaning or contemplation of this Court's June 8, 1973 Order, since it is not a charge imposed by commission firms for services per-

---

4. Those exchange activities which are allegedly to be funded by Rule 136 nonmember fees are:
   1. "Costs of the Compliance Department including surveillance, investigations and audits, and the preparation of any reports or data related to the maintenance of an orderly market or to public information."
   2. "Costs of education and market information activities not recovered through a direct charge for services performed or material provided."

3. "Costs of facilities available to the public at the exchange or at other locations for the purposes of public information and support costs attendant thereto. (This should not include costs of promotion as ordinarily defined.)"
4. "Twenty-five per cent of the cost of Market Report operations which is deemed to be the portion of that activity related to the accumulation of the public statistical data base."

See Plaintiffs' Exhibit A.

formed by them, but is a fee imposed by the exchange directly on, and for the ultimate benefit of, nonmember traders.

Due to the phase-out of fixed commission rates, the necessity of shifting part of the costs of the exchange's operations to nonmembers can be reasonably expected in order to reduce the financial burden on members and the attendant danger of membership attrition.[5] Rule 136, in theory, is a conceivably reasonable and appropriate measure to share the respective costs and expenses of doing business on the exchange. It is clear to this Court that Rule 136 as it is constructed does not appear to violate the spirit or letter of this Court's June 8, 1973 Order.

Further, the plaintiffs' contention is purely speculative that Section D of Rule 136 violates federal antitrust laws in that it provides, in the event of nonpayment, for "boycotting" nonmember customers and liquidation of their accounts. Any putative violation of the federal antitrust laws by Rule 136(D) is contingent on the unreasonable exercise by the Board of Trade or its members of their discretion involving the enforcement of the "exchange service fee." It is impossible to now find that the Board of Trade or its members will, in the future, abuse their discretion.

Accordingly, it is hereby ordered that the plaintiffs' motion for an order requiring defendants to show cause why they should not be adjudged in contempt is denied.

---

5. The CEA Administrator's Report on the Rules and Practices of the Chicago Board of Trade Concerning Minimum Rates of Commission and Brokerage Fees of July 1972 states in relevant part:

> "The Board might change its method of financing its operations to lighten the financial burden on members as compared to non-members, thereby creating an added incentive for buying/retaining a membership. One method could be to levy charges on transactions (paid by every trader) instead of using membership assessments.

> " . . . [The Board] could, for example, levy a small fee on each transaction and obtain enough income to operate the exchange without assessing members. Based on the 8,110,108 'round turn transactions' that were executed on the Board in 1970, a transaction fee of 10¢ per trade would have returned $811,011. This would have replaced the $736,050 collected from membership assessments in 1970 and left a gain of $74,961. . . . Under such conditions, buying or holding a membership on the exchange might be desirable even if a member did not trade heavily in commodities." (Report, pp. 77–78.)